## THE THREE FRIENDS.[1]

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 701. Argued February 15, 1897. — Decided March 1, 1897.

When a libel in admiralty is ordered to stand dismissed if not amended within a time named, the prosecution of an appeal within that time is a waiver of the right to amend, and the decree of dismissal takes effect immediately.

In admiralty cases, although the decree of the Circuit Court of Appeals is made final in that court, this court may require any such case to be certified for its review and determination, with the same power and authority as if it had been brought here, directly, from the District or Circuit Court; and although this power is not ordinarily to be exercised, the circumstances justified the allowance of the writ in this instance.

The forfeiture of a vessel proceeded against under Rev. Stat. § 5283, does not depend upon the conviction of the person or persons charged with doing the acts therein forbidden.

Neutrality, strictly speaking, consists in abstinence from any participation in a public, private or civil war, and in impartiality of conduct toward

---

[1] The docket title of this case is The United States, Petitioner, v. The Steamer Three Friends, her engines, etc., Napoleon B. Broward and Montcalm Broward, claimants.

both parties: but the maintenance unbroken of peaceful relations be-
tween two powers when the domestic peace of one of them is disturbed
is not neutrality in the sense in which the word is used when the disturb-
ance has acquired such head as to have demanded the recognition of bel-
ligerency; and, as mere matter of municipal administration, no nation
can permit unauthorized acts of war within its territory in infraction of
its sovereignty, while good faith towards friendly nations requires their
prevention.

The word "people," as used in Rev. Stat. § 5283, forbidding the fitting out
or arming of vessels with intent that they shall be employed in the ser-
vice of any foreign people, or to cruise or commit hostilities against the
subjects, citizens or property of any foreign people with whom the United
States are at peace, covers any insurgent or insurrectionary body conduct-
ing hostilities, although its belligerency has not been recognized.

Although the political department of the government has not recognized
the existence of a *de facto* belligerent power, engaged in hostility with
Spain, it has recognized the existence of insurrectionary warfare, pre-
vailing before, at the time, and since the forfeiture sought to be enforced
in this case was incurred; and the case sharply illustrates the distinction
between recognition of belligerency, and recognition of a condition of
political revolt; between recognition of the existence of war in a mate-
rial sense, and of war in a legal sense.

The courts of the United States having been informed by the political de-
partment of the existence of an actual conflict of arms, in resistance of
the authority of a government with which the United States are on terms
of peace and amity, although acknowledgment of the insurgents as bel-
ligerents has not taken place, the statute is applicable to the case.

The order for the release of the vessel was improvidently made, as it should
not have been released.

THE steamer Three Friends was seized November 7, 1896,
by the collector of customs for the district of St. John's,
Florida, as forfeited to the United States under section 5283
of the Revised Statutes, and, thereupon, November 12, was
libelled on behalf of the United States in the District Court
for the Southern District of Florida.

The first two paragraphs of the libel alleged the seizure
and detention of the vessel, and the libel then continued :

"Third. That the said steamboat or steam vessel, the 'Three
Friends,' was on, to wit, on the twenty-third day of May, A.D.
1896, furnished, fitted out and armed, with intent that she
should be employed in the service of a certain people. to wit,
certain people then engaged in armed resistance to the gov-
ernment of the King of Spain, in the island of Cuba, to cruise

and commit hostilities against the subjects, citizens and property of the King of Spain, in the island of Cuba, with whom the United States are and were at that date at peace.

"Fourth. That the said steamboat or steam vessel, 'Three Friends,' on, to wit, on the twenty-third day of May, A.D. 1896, whereof one Napoleon B. Broward was then and there master, and within the said southern district of Florida, was then and there fitted out, furnished and armed, with intent that said vessel, the said 'Three Friends,' should be employed in the service of a certain people, to wit, the insurgents in the island of Cuba, otherwise called the Cuban revolutionists, to cruise and commit hostilities against the subjects, property and people of the King of Spain, in the said island of Cuba, with whom the United States are and were then at peace.

"Fifth. That the said steamboat or steam vessel, 'Three Friends,' on, to wit, on the twenty-third day of May, A.D. 1896, and whereof one N. B. Broward was then and there master, within the navigable waters of the United States, and within the southern district of Florida and the jurisdiction of this court, was then and there, by certain persons to the attorneys of the said United States unknown, furnished, fitted out and armed, being loaded with supplies and arms and munitions of war, and it, the said steam vessel 'Three Friends,' being then and there furnished, fitted out and armed with one certain gun or guns, the exact number to the said attorneys of the United States unknown, and with munitions of war thereof, with the intent, then and there, to be employed in the service of a certain people, to wit, certain people then engaged in armed resistance to the government of the King of Spain in the island of Cuba, and with the intent to cruise and commit hostilities against the subjects, citizens and property of the King of Spain, in the said island of Cuba, and who, on the said date and day last aforesaid, and being so furnished, fitted out, and armed as aforesaid, then and there aforesaid, from the navigable waters of the United States, to wit, from the St. John's River, within the southern district of Florida, and within the jurisdiction of this court aforesaid, proceeded upon a voyage to the island of Cuba aforesaid, with the in-

tent aforesaid, contrary to the form of the statute in such case made and provided. And that by force and virtue of the acts of Congress in such case made and provided, the said steamboat or steam vessel, her tackle, engines, machinery, apparel and furniture became and are forfeited to the use of the said United States.

"Sixth. And the said attorneys say that by reason of all and singular the premises aforesaid, and that by force of the statute in such case made and provided, the aforesaid and described steamboat or steam vessel 'Three Friends,' her tackle, machinery, apparel and furniture, became and are forfeited to the use of the said United States."

And concluded with a prayer for process and monition and the condemnation of the vessel as forfeited. Attachment and monition having issued as prayed, Napoleon B. Broward and Montcalm Broward, master and owners, intervened as claimants; applied for an appraisement of the vessel and her release on stipulation; and filed the following exceptions to the libel:

"1. Sec. 5283, for an alleged violation of which the said vessel is sought to be forfeited, makes such forfeiture dependent upon the conviction of a person for doing the act or acts denounced in the first sentence of said section, and as a consequence of conviction of such person; whereas the allegations in said libel do not show what persons had been guilty of the acts therein denounced as unlawful.

"2. The said libel does not show the 'Three Friends' was fitted out and armed, attempted to be fitted out and armed, or procured to be fitted out and armed in violation of said section.

"3. The said libel does not show the said vessel was so fitted out and armed, or so attempted to be fitted out and armed, or so procured to be fitted out and armed or furnished, with the intent that said vessel should be employed in the service of a foreign prince, or state, or of a colony, district or people with whom the United States are at peace.

"4. The said libel does not show by whom said vessel was so fitted out.

"5. Said libel does not show in the service of what foreign

prince, or state, or colony, or district, or body politic the said vessel was so fitted out.

"6. The said libel does not show that said vessel was so armed or fitted out or furnished with the intent that such vessel should be employed in the service of any body politic recognized by or known to the United States as a body politic."

The vessel was appraised at $4000 and a bond on stipulation given for $10,000, upon which she was directed to be released. The cause came on to be heard upon the exceptions to the libel, and on January 18 the following decree was entered:

"This cause coming on to be heard upon exceptions to the libel and having been fully heard and considered, it is ordered that said second, third, fifth and sixth exceptions be sustained and that the libellant have permission to amend said libel, and in event said libel is not so amended within ten days the same stand dismissed and the bond herein filed be cancelled."

From this decree the United States, on January 23, prayed an appeal to the United States Circuit Court of Appeals for the Fifth Circuit, which was allowed and duly prosecuted.

The following errors were assigned:

"First. For that the court over the objection of the libellants allowed the said steam vessel 'Three Friends' to be released from custody upon the giving of bond.

"Second. For that the court erred in sustaining the 2d, 3d, 5th and 6th exceptions of the claimants to the libel of information of the libellants.

"Third. For that the court erred in entering a decree dismissing the libel of information herein."

On February 1 application was made to this court for a writ of certiorari to bring up the cause from said Circuit Court of Appeals, and, having been granted and sent down, the record was returned accordingly.

*Mr. Assistant Attorney General Whitney* for the United States.

The following propositions seem to be clearly established:

(1) That a recognition of belligerency is not always accom-

plished by a recognition of the fact that actual hostilities are in progress.

(2) That the existence of a civil war, in the ordinary sense of that term, may be made known by what is sometimes called a recognition of insurgency.

(3) That to justify a recognition of belligerency there must be something more than the mere existence of a civil war — the nation which gives the recognition must be impelled to do so for the protection of its own rights or those of its citizens.

(4) That the recognition of an insurgent body as a belligerent, in the technical sense of the phrase, makes that insurgent body a state for all purposes of the war. Lawrence, Principles of International Law, §§ 162, 163 ; Dana's Wheaton on International Law, § 23, note ; Hall's International Law, 4th ed. pp. 32, 35–37.

The consequences of a recognition of the belligerency of an insurgent body — while neither increasing nor diminishing the duty of non-interference — are very serious. The neutral nation must abandon further claims for reparation on account of damages suffered by its citizens through the hostilities. Its merchantmen must submit to the rights of blockade, visitation, search and seizure of contraband articles on the high seas.

Hence a recognition of belligerency should never be given except when it becomes necessary on the grounds above stated, or in the rare instances when armed intervention is justifiable.

Such a recognition can often be forced by either party to the warfare by establishing an effective blockade.

It is forced by an insurgent body when it enters into maritime operations and maintains the right to search neutral vessels for contraband of war. The neutral is thus forced either to recognize the vessels of the insurgents as belligerents or to pursue them as pirates, for if they molest third parties they must be one or the other, whatever the true definition of piracy may be. See *The Malek Adhel*, 2 How. 210 ; *The Ambrose Light*, 25 Fed. Rep. 408, and auth. cit. ; Dr. Wharton's criticism thereon in 33 Alb. L. J. 125, and auth. cit. ;

Lawrence, International Law, § 122; Dana's Wheato1 § 124, note; 1 Op. Attys. Gen. 249, 252.

When insurgents have no maritime force, and the war is not in contiguous territory, a recognition of belligerency harms them as well as the neutral; for it gives to their enemy rights of search on the high seas which they themselves are unable to utilize. Thus if we should be forced to recognize the present hostilities in Cuba as a civil war, technically speaking, the shipment of arms, ammunition and other contraband goods to the insurgents would become much more difficult.

Hence recognitions of belligerency by a neutral nation are comparatively rare. Recognitions of the fact that hostilities are in progress are, however, quite common. To such recognitions. Dr. Wharton has applied the convenient phrase " recognition of insurgency." 3 Whart. Int. Law Dig. 2d ed. 351; Criticism of Ambrose Light Case, 33 Alb. L. J. 125.

The existence of a recognized state of belligerency is not an express requirement of this statute. There could be no object in discriminating between recognized and unrecognized belligerents. The words " colony," " district " and " people " are not apt if parties recognized as belligerent are the only ones intended to be referred to. A belligerent is not recognized as a colony, as a district, or as a people, but as a prince or as a state. It is true that " a people " is a phrase often used as equivalent to a state. This cannot be its use in the present statute, because it was introduced as an amendment to a law which already contained the word " state." The new word is not to be interpreted as mere surplusage, but is to be given some separate force if possible. *Market Co.* v. *Hoffman*, 101 U. S. 112, 115, 116; Opinion of Justices, 22 Pick. 571, 573. This principle was applied to the British Foreign Enlistment Act in *Attorney General* v. *Sillem*, 2 Hurlst. & Coltm. 431, 572, quoting Lord Coke in 8 Rep. 117. Assuming, then, that the word is not used as the equivalent of a state or a nation, it must be used in the alternative sense of a body of men less than a nation who are bound together by ties of blood, neighborship, common enterprise or otherwise.

*Situation of the Latin-American world at the time of the neutrality act of 1817.*

The contesting bodies may be divided into classes, as follows :

(*a*) *The leading Spanish-American colonies, whose position as belligerents was in doubt.* — Whether or not the belligerency of the South American revolutionists had been recognized in Madison's administration depends upon the question — how much formality is necessary in a recognition of belligerency? Is it only recognized by the President or Secretary of State in a formal document declaring the fact to the world or communicating it to Congress? Or is it recognized also whenever the President or one of the Cabinet officers, in an ordinary official letter of instruction, or in transmitting information to a Congressional committee, uses the term "belligerent" or "civil war"? This cannot be. Were it so, then on the same principle President Monroe would have been held to acknowledge the *independence* of the South American governments as early as January, 1819. 4 Wheat. App'x, p. 41.

The former method was held necessary in *The Conserva*, 38 Fed. Rep. 431, 437. On this principle Henry Clay considered that neutrality had not been recognized at the time of the act (Annals of Congress, March 18, 1818, p. 1415), and Mr. Wheaton seems to have agreed with him (4 Wheat. App'x, p. 23) ; but President Monroe took the opposite view (Annual Message of December 2, 1817). President Madison had used very guarded language in his message of December 26, 1816. Monroe's view was probably based on his own language as Secretary of State in his letter of January 19, 1816, to the Spanish minister, Onis, and his letter of January 10, 1817, to the Chairman of the Foreign Affairs Committee of the House of Representatives, John Forsyth, and on the circular of Mr. Rush, Secretary of the Treasury, to all collectors of customs, dated July 3, 1815, directing the admission to our ports of all insurgent flags. This circular, however, named no particular flag, and imposed no condition as to executive recognition.

The states whose belligerency was recognized by Monroe in 1817 were doubtless those whose independence was recognized in 1822, namely, New Granada and Venezuela (after-

wards united as Colombia), Buenos Ayres (officially known as the United Provinces of South America), and Chile — the successful revolts of Peru and Mexico having been later than 1817. That the recognition of belligerency did not apply to all the minor insurgencies has been expressly ruled by this court in *The Nueva Anna and Liebre*, 6 Wheat. 193.

(b) *Certain Spanish or Portuguese districts whose belligerency had not then been and never was recognized.* — One of these — Paraguay — has been already referred to. This may have attracted no attention, as our people did not come into contact with it, though probably informed of its existence. 4 American State Papers, Foreign Relations, pp. 219, 222, 225, 250, 265, 278, 339.

Second only to Buenos Ayres, however, if not first of all the powers of Latin America in capacity to make trouble, was the now forgotten but then world-famous General Artigas, who held sway with various ebbs and flows of fortune on the east bank of the La Plata River in the old Spanish intendency of Banda Oriental, called by him the Oriental Republic, and now known as the independent Republic of Uruguay. Any recognition of his claims would have given offence, not only to Spain, but to Portugal, and even to Buenos Ayres, for all three laid claim to his territory, and with all three he was at war. His main city, Montevideo, was generally in Portuguese control. Yet cruisers under the "Artigan flag," and claiming to be commissioned by Artigas, were on all the seas. They did the main injury complained of by the Portuguese government. H. R. Ex. Doc. No. 53, 32d Cong. 1st sess. pp. 193–200; see also *The Gran Para*, 7 Wheat. 471. Notices of his proceedings are to be found in 4 American State Papers, Foreign Relations, at pp. 173, 174, 218, 219, 221, 225, 250, 268, 274, 288, 289, and in argument of counsel, 7 Wheat. pp. 476–481. His country had been claimed by both Spain and Portugal. Portugal had surrendered it in 1778, but renewed the claim when the South American revolutions broke out. It was the Portuguese who finally conquered Artigas, and the country was then for a time annexed to Brazil. In 1817 and 1818 the Artigas revolt

seems generally to have been regarded as directed against
Portugal rather than against Spain, but Monroe's recognition
of belligerency in December, 1817, applied only to "the con-
test between Spain and the colonies," as was pointed out by
Attorney General Wirt.   1 Op. Attys. Gen. 249.

(c) *Hayti*. — This unfortunate island had long been free
from the sovereignty of France, but its independence had not
been recognized by us, and was not so recognized prior to
1862, because it was under negro domination.   At that time
it was divided between two negro chieftains who were en-
gaged in a bloody contest, but whose belligerency had not
been recognized.   As stated by Attorney General Wirt (*ut
sup.*), "our Government had never acknowledged those sov-
ereignties, not even by the recognition of a civil war between
themselves or their mother countries."   Henry Clay said that
" we had not recognized the war as a civil war, etc., or in any
manner so regarded it as that a case arising under it in our
courts could be viewed in the same light as a case occurring in
the existing conflict in South America."   Annals of Congress,
March 18, 1818, p. 1425.

(d) *Amelia Island and Galveston*. — These places were the
rendezvous of privateers, Aury (their best-known leader) claim-
ing the right to fly the Venezuelan, Artigan, and other revolu-
tionary flags.   1 Whart. Int. Law Dig. § 50*a*.   They were
practically pirates, as stated by Monroe in his message of 1817.

Counsel further argued that the insertion of the words
" district or people " in the act of 1817, which was by amend-
ment adopted without debate on January 28, was probably
due to Attorney General Rush, who was then preparing for
argument the case of *Gelston* v. *Hoyt*, 13 Johns. 141, 561, 590;
3 Wheat. 246, 278.   But that case related to the contest be-
tween the Haytian chieftains aforesaid, neither of whom was
recognized as a belligerent.

It may be added that John Forsyth, who had had charge
in the House of Representatives of the acts of 1817 and 1818,
was Secretary of State at the time of the revolution in Texas.
He evidently then regarded the operation of these acts as in
nowise dependent upon a recognition of belligerency.   He

directed the district attorneys beforehand to enforce these laws "should the contest begin." H. R. 24th Cong. 1st sess. Doc. No. 256, p. 36, and directed prosecutions for enlistment in the insurgent cause before the independence of Texas was declared. Id., p. 37; see p. 3.

In 1837 an insurrection broke out in Canada. Belligerency of the insurgents was never recognized. Van Buren, in his annual message of 1838, shows clearly that he regarded them in the same light in which the present Cuban insurrectionists have been regarded. A neutrality act was passed, however; and the words "colony, district or people" were regarded as sufficient for the case. Act of March 10, 1838, c. 31, §§ 1, 2, 5. The act expired in two years by its own limitation, § 9.

If any executive recognition is necessary to put the statute in operation, that recognition had been given when the libel was filed, by the messages and proclamations of President Cleveland.

When a vessel belonging to citizens of the United States commits hostilities upon the high seas against a friendly power, her act is *prima facie* piratical. She is forfeit, and her owners, officers and crew are liable to be hanged. See *The Ambrose Light*, 25 Fed. Rep. 408, and auth. cit.; Lawrence, International Law, § 122; Dana's Wheaton, § 124, note. If the act is done in the interests of a colony, district or people struggling for independence, then it is freed from this imputation, and the punishment is under a different and milder law. How is the existence of such a contest to be established? It is matter of judicial notice, not proof. It is not in its nature susceptible of proof by witnesses, and, besides, from motives of policy the judiciary looks to the Executive for information.

As the present insurrection is for independence it is not necessary to inquire whether the pursuit of this object is a prerequisite to the operation of the statute. This does not appear to be required, and the statute seems equally applicable to revolts for the control of an already established state, like the recent Chilean war, or for civil rights, like our Revolution

before July 4, 1776, the Buenos Ayres revolution before 1816, and the recent proposed revolt in Johannesburg.

The bond or stipulation for the release of the vessel pending suit is not authorized by law; and, if authorized, should have been denied in the case of so serious a charge, in the absence of a defence upon the merits and of an affidavit of merits.

*Mr. William Hallett Phillips* for appellees.

From the variety of ways in which it is attempted in the libel to state what constitutes "a people," it is evident that the government experienced much difficulty in making the law agree with the facts. In some places it is alleged that the people referred to were certain persons, insurgents, revolutionists, engaged in armed resistance to the government of Spain. There is throughout the libel an endeavor on the part of the Attorney General to show a status of " a people," so that it should appear he does not refer to a people meaning simply persons. But the endeavor to escape from this meaning of individuals has not been successful, because, take as you will these various statements of "a people," arrange the designations as you may, the matter comes to this, that the reference after all is only to unorganized individuals — persons; and that is the signification which the court must draw from the use of the words "a people" in the libel. The Attorney General has attached too much significance to the question of belligerency. He seems to regard this question as the controlling one in the case. But the decree does not rest upon this point. Belligerency is only important as showing that to constitute "a people," within the meaning of the act, there must be either an actual independent state, or a power *de facto*, and that power *de facto* may or may not be recognized as belligerent. The real question is this: Can there be any proceeding under section 5283 against parties charged with fitting out a ship for the purpose of being employed by a state or "a people," unless it is shown that there exists a state in every sense of the word; a state among the family of nations, or else a *de facto*

government recognized in the form of a political or other organization; "a people" claiming to be a government or actually exercising sovereignty. That there must exist "a people" in the sense I am contending for, is shown conclusively by the mention in the section of the words "subjects, citizens, or property of a people."

Thus section 4, act of 1817, 3 Stat. 370, now § 5285, Rev. Stat., which applies to the augmentation of force of any ship of war or armed vessel within the United States "in the service of any foreign prince or state or of any colony, district or people, or belonging to the subjects or citizens of any such prince, state, colony, district or people."

How can there be subjects of "a people," unless that people constitutes a government *de jure* or *de facto?* The Attorney General assumes a position which narrows the controversy. In the court below, when the libel was filed, the idea prevailed that "a people," within the meaning of the act, meant any people, persons, individuals, and it was so stated. But now the Attorney General is driven to the position that "a people" must denote a body, must mean a community, an organization which actually exercises sovereignty or claims to exercise sovereignty over a country. The inquiry therefore is reduced to this: Is there shown in the record, either in the libel or otherwise, that there exists "a people" as is now contended by the United States; to wit, "a people" exercising or claiming sovereignty over Cuba either *de jure* or *de facto?* The Attorney General mentions certain persons as "a body." He refers to them as insurrectionists, revolutionists; reference is made to the President's proclamations and messages as establishing a status of "a people." The brief says: "This case brings up a question which has been recently much discussed; namely, whether the words, 'any colony, district or people,' include insurrectionary bodies, like the present 'Republic of Cuba,' whose belligerency, technically speaking, has not yet been recognized by the executive department of our Government." I do not understand what is meant by this expression, "technically speaking." I suppose it means legally speaking. What is this "body" to which reference is made

as the present Republic of Cuba? Is there any such question in the present case? I submit that there is not. The Attorney General asks the court to contemplate the Republic of Cuba for one purpose only, for that of punishment. When he has succeeded in punishing persons for aiding the Republic of Cuba, he says to the court: "There is no such republic, there is no such people." They are the People of the Mist. They were here for a moment, they have now disappeared! As a matter of fact, can the court take notice of any Republic of Cuba or anybody called the Republic of Cuba? I should be very glad if the court could do so, but I think they are inhibited by the circumstances of this case and the statements in this record. Neither in the proclamations of the President, nor in his messages, nor in the libel, is there any mention of such a body as the Republic of Cuba or of any other body. We submit that the Government has not succeeded in creating for the purposes of this case an organized political body, or a community, or a government, or what is the same thing, a power, "a people." The reference in the libel is to insurgents, to revolutionists, to certain persons engaged in armed resistance to the government of Spain in the island of Cuba. Spain has never conceded that Cuba as a colony or " a people " is in insurrection against her, nor has the President stated it. It is true that there are insurgents there, or revolutionists, if you choose so to call them, or persons engaged in armed resistance to Spain. You may designate them as the Spanish government does and call them brigands, banditti, outlaws. You may bestow upon them the character they possess in the eyes of Americans, of patriots. What legal definition or distinction can be drawn from any one of these designations? For legal purposes you might just as well use one of these terms as another; they all fail to define " a people." The appellant's case is not strengthened by reference to executive documents. You will look in vain in any of these to find any recognition of a government or of "a people," of a sovereignty or of a power, having actually arisen against Spain. The President in his proclamations refers to "civil disturbances existing in the island of Cuba." He is very

careful in the use of language. He was not so willing as the Attorney General now is to acknowledge a republic existing or claiming sovereignty over Cuba. Such a concession would have involved many problems he was desirous of avoiding. The Attorney General further insists that the President's messages contained a description of this "body" or sovereignty in whose service it is alleged the vessel was to be employed. But these communications are as cautious as the proclamations not to commit this country to a concession that there exists in Cuba a sovereignty or government opposed to that of Spain. On the contrary it is definitely asserted that the only sovereignty on that island is the sovereignty of Spain.

The Secretary of State in his report for 1896, communicated to Congress by the President, says:

"So far as our information shows, there is not only no effective local government by the insurgents in the territories they overrun, but there is not even a tangible pretence to establish administration anywhere. Their organization, confined to the shifting exigencies of the military operations of the hour, is nomadic, without definite centres, and lacking the most elementary features of municipal government. There nowhere appears the nucleus of statehood. The machinery for exercising the legitimate rights and powers of sovereignty, and responding to the obligations which *de facto* sovereignty entails in the face of equal rights of other states, is conspicuously lacking. It is not possible to discern a homogeneous political entity, possessing and exercising the functions of administration, and capable, if left to itself, of maintaining orderly government in its own territory and sustaining normal relations with the external family of governments."

The President, in his message for 1896, says:

"As the contest has gone on, the pretence that civil government exists on the island, except so far as Spain is able to maintain it, has been practically abandoned. Spain does keep on foot such a government, more or less imperfectly in the large towns and their immediate suburbs. But, that exception being made, the entire country is either given over to anarchy

or. is subject to the military occupation of one or the other party. It is reported indeed on reliable authority that, at the demand of the commander-in-chief of the insurgent army, the putative Cuban government has now given up all attempt to exercise its functions, leaving that government, confessedly, (but there is the best reason for supposing it always to have been in fact) a government merely on paper. . . . But imperfect and restricted as the Spanish government of the island may be, no other exists there — unless the will of the military officer in temporary command of a particular district can be dignified as a species of government."

The President denies not only the existence of any actual government on the part of those in insurrection, but even the claim of government; he says that there are scattered bands, wandering nomads, opposing the authority of the government of Spain. Such is his description of those whom the Attorney General now designates as "a people" or Republic of Cuba!

This prosecution is a novel one. The "civil disturbances" on the island of Cuba have existed for two years, and this is the first proceeding of the kind yet instituted under section 5283. Section 5286, as to military enterprises, covers all phases of hostile undertakings set on foot in this country by the fitting out of ships, by military expeditions, by enlistments, or by commissions. This section 5286 is applicable in time of peace as well as in time of war, in time of recognized war as well as in time of unrecognized war, and it must be admitted embraces the whole field of hostile operations. It makes it a crime against the laws of the United States to begin on our soil such hostile operations or to carry them on from hence. It is a domestic criminal statute and a domestic statute wholly. How different is section 5283! The explanation is that all along it has been generally supposed that the section treating of fitting out of cruisers of war only applied where there was open public war, where there were belligerents, where there was neutrality in the legal sense of that term.

The real reason why this proceeding is at this late day resorted to, is to obtain a condemnation of the vessel for

Mr. Phillips' Argument for Appellees.

doing what this court in the *Wiborg case* declared lawful; that is, the transportation of war supplies to those engaged in insurrection. It is proposed, by resorting to proceedings for a forfeiture of the vessel in a court of admiralty, to take away from the citizen the right of a trial by jury on the allegation of a crime for which the government seeks to exact a forfeiture. But if the proceeding was under section 5283, prohibiting military enterprises, not only would a jury trial be necessary, but in addition the government could not exact a forfeiture. No doubt could have existed in the minds of the jurists who framed the amendment to the act of 1794, as contained in the act of 1817, regarding the meaning of the expression "a people." That term has already been defined in the law regarding maritime insurance. *Nesbitt* v. *Lushington*, 4 T. R. 783, was decided by the Kings Bench in 1792, two years before the act of 1794. It was an adjudication of great importance, and the argument was by some of the most considerable members of the English bar. A ship approaching the Irish coast was set upon by an organized force for the purpose of seizing the ship, and holding her until the captain should agree to sell them the corn, with which she was loaded, at a price they stipulated. This they proceeded to do. The question arose, whether this was a restraint or detainment by "a people," and it was held in the negative. The court said, that the use of the word "people," in that connection, meant a power, "a people," a government. Lord Kenyon said, the word "people" referred to the ruling power of the country. Mr. Justice Buller observed, that it denoted the supreme power of the country, whatever that might be; that the word "people" did not apply to individuals but to nations in their collective capacity.

No question of jurisprudence was better settled than that appertaining to losses under such policies, by detention "of all kings, princes and people, of what nation, condition or quality soever." 2 Dane Abr. 113. In the authoritative work, Marshall on Insurance (1810), the author says that under these words, which are nearly the same in the policies of all the maritime countries, the insurers are liable for all losses occa-

sioned by arrests or detention of the ship or goods insured by the authority of any prince "or public body claiming to exercise sovereign power under what pretence soever." B. 1, ch. 12, sec. 5. In the same section the author observes that the word "people" in the policy means a people or nation, not a mob. "By the word 'people' in the policy is not to be understood any promiscuous or lawless rabble that may be guilty of attacking or detaining the ship; it means a people — that is, a nation in its collective and political capacity."

In Park Mar. Ins. (2 Am. ed. 1799), 78, it is said: "What the word 'people' in this clause of a policy of insurance means has lately been judicially settled."

In *Mauran* v. *Insurance Company*, 6 Wall. 1, this court confirms such construction, and discusses its bearing upon our neutrality acts.

Chancellor Kent was quoted to the effect that the stipulation of indemnity against takings at sea, arrests, restraints and detainment of all kings, princes and people, refers only to the acts of government for government purposes, whether right or wrong. 3 Com. 302, note D, 6th edition.

Other illustrations were made of governments *de facto*, which, for certain purposes, are recognized as if they were *de jure* and regularly constructed nationalities: "The court, in the case of *Nesbitt* v. *Lushington*, 4 T. R. 763, fitly described the character of the government contemplated in the clause respecting the restraints, etc., of kings, princes or people, viz., 'the ruling power of the country,' 'the supreme power,' 'the power of the country, whatever it might be' — not necessarily a lawful power or government, or one that had been adopted into the family of nations."

The court concluded that the so-called Confederate government, being in the possession of the supreme power of the district of country over which its jurisdiction extended, was a government *de facto*, which could make a capture within the meaning of the policy. *Mauran* v. *Insurance Co.*, 6 Wall. 1, 13.

No reason exists why the word "people" should have one sense when used in a maritime policy, but a different sense as

used in the statute. The one assures protection against the
acts of such a "people," while the other prohibits acts. Let
us suppose that in view of this settled definition accepted by
this court in the case of *Mauran* v. *Insurance Company*, 6
Wall. 1, the owners of the Three Friends, being about to
take a voyage to Cuba, obtained a maritime insurance upon
the vessel, containing the clause as to restraints of kings,
princes and people. The vessel, while on her voyage, is
arrested by persons engaged "in a civil disturbance in Cuba."
An action is brought against the insurers in the United States
District Court for the Southern District of Florida. The ques-
tion arises as to whether the restraint was by "a people"
within the meaning of the instrument. The District Court
decides in view of the accepted meaning of that term, that the
restraint was not by "a people," and dismisses the proceeding.
At the same time the Attorney General of the United States
files a libel of condemnation in the same court, against the
same vessel, on the ground that she had been fitted out in this
country to be used in the service of the same people described
in the other suit. The District Judge can only decide that he
has already passed upon the meaning of the expression. He
could not admit a different meaning of the same word when
used in the act of Congress. In both instances the word re-
ferred to a power, or community, or government, whether right
or wrong. On the one hand, there was a provision in the mari-
time law enabling a party to insure himself against certain
maritime losses. On the other hand, there was a provision in
an act of Congress which subjected a party to punishment and
loss on account of certain maritime operations. The court
could not give a different meaning to the term "a people," un-
less compelled by the association of the word with other words
in the act. The question therefore is, whether the legislature
meant something different in the use of the word from what was
indicated by every other word associated with it. In effect,
the Government contends that the rule *noscitur a sociis* is not
applicable; that while the words "any prince, state, district,
colony," are all words of government, are all words of sover-
eignty, all refer to powers, yet the signification of the words

"any people," is different. That it does not necessarily apply to any sovereignty, or body claiming sovereignty, but may denote persons unorganized as a political entity.

This expression, "any people," cannot be disassociated from the terms which precede it — any foreign prince or state, or any colony or district.

In the language of Lord Kenyon in *Nesbitt* v. *Lushington, supra*, "the meaning of the word 'people' may be discovered here by the accompanying words, *noscitur a sociis*. It means, the 'ruling power of the country.'"

It would be strange, in the light of history, if all the other terms refer to the people in their collective and political capacity, a body politic or assuming to be a body politic, while this expression, "a people," may be construed to refer in another sense to persons in their individual capacity.

What, in 1817, was "the actual situation of the world," to use the language of Chief Justice Marshall? It was the situation of America, and especially of South America, which, by provinces, countries, districts, peoples, was in a state of recognized public war against Spain. The act of 1794 applied only to princes or states, and did not contemplate these new belligerent powers, and therefore, in 1817, it was found necessary to adapt the law to the actual situation of the world. I only dwell upon belligerency for the purpose of signifying a designated sovereignty or asserted government not yet recognized as independent or admitted as such into the family of nations. It is stated by the Attorney General that before this act of 1817 the word "state" referred to such powers as those of South America, and that it could not have been intended that Congress inserted the words "a people," unless they had meant something else than a state, unless they referred to a collection of persons. The Attorney General says something in addition to that was intended by the use of the word "people," and claims that the act of 1794 covered belligerents. I submit that this was not the interpretation of the act of 1794. Chief Justice Marshall, on the circuit, disclaimed that the words "prince or state" covered the case of one of the recognized South American belligerents. I refer to

the case of *The Santissima Trinidad.* Chief Justice Marshall remarked as follows :

"However serious may be the doubt, whether a section of a nation struggling for its independence may come within the prohibitions of the act [1794], there can be no doubt that such a people come within the more ample provisions of the law of nations. Whether Buenos Ayres be a state or not, if she is in a condition to make war and to claim the character and rights of a belligerent, she is bound to respect the laws of war; and the government which concedes her those rights is bound to maintain its own neutrality, unless it means to become a party to the war, as entirely as if she were an acknowledged state. She has no more right to recruit her navy within the United States than Spain would have, and this government is as much bound to restrain her from using our strength in the war as to restrain her enemy." 1 Brock. 488; 7 Wheat. 283. The libel in this case was filed in 1817.

The meaning of the words "foreign prince or state" was announced in *Gelston* v. *Hoyt.* 3 Wheat. 323.

In that case the evidence was that the ship was fitted out and armed with intent that she should be employed in the service of that part of the island of San Domingo which was then under the government of Pétion, to commit hostilities upon the subjects of that part of the island of San Domingo which was then under the government of Christophe.

The court held that neither of these allegations could be supported, inasmuch as the government of the United States had never recognized either of these governments as "a foreign prince or state."

They had not been recognized either as belligerents or as independent communities. On the contrary, our Government had acknowledged they were parts of the French possessions, and had regulated, as requested by France, our trade therewith.

In *United States* v. *Palmer*, the Circuit Court of the United States for the First Circuit, consisting of Judges Story and Davis, divided in opinion upon certain questions, which they certified here. Some of these were as follows:

"5th. Whether any revolted colony, district or people, which have thrown off their allegiance to their mother country, but have never been acknowledged by the United States as a sovereign independent nation or power, have authority to issue commissions to make captures on the high seas of the persons, property and vessels of the subjects of the mother country who retain their allegiance. . . .

"6th. Whether an act which would be deemed a robbery on the high seas, if done without a lawful commission, is protected from being considered as a robbery on the high seas when the same act is done under a commission or the color of a commission from any foreign colony, district or people which have revolted from their native allegiance, and have declared themselves independent and sovereign, and have assumed to exercise the powers and authorities of an independent and sovereign government, but have never been acknowledged or recognized as an independent or sovereign government or nation by the United States or by any other foreign state, prince or sovereignty."

"10th. Whether any colony, district or people, who have revolted from their native allegiance and have assumed upon themselves the exercise of independent and sovereign power, can be deemed in any court in the United States an independent or sovereign nation or government until they have been acknowledged as such by the government of the United States; and whether such acknowledgment can be proved in a court of the United States otherwise than by some act or statute or resolution of the Congress of the United States, or by some public proclamation or other public act of the executive authority of the United States directly containing or announcing such acknowledgment, or by publicly receiving and acknowledging an ambassador or other public minister from such colony, district or people; and whether such acknowledgment can be proved by mere inference from the private acts or private instructions of the executive of the United States, when no public acknowledgment has ever been made, and whether the courts of the United States are bound judicially to take notice of the existing relations of the

United States as to foreign states and sovereignties, their colonies and dependencies.

" 11th. Whether, in case of a civil war between a mother country and its colony, the subjects of the different parties are to be deemed, in respect to neutral nations, as enemies to each other, entitled to the rights of war." . . .

Chief Justice Marshall, March 14, 1818, 3 Wheat. 610, 626, delivering the opinion of the court, observed :

" The first four questions relate to the construction of the 8th section of the 'act for the punishment of certain crimes against the United States.' The remaining seven questions respect the rights of a colony or other portion of an established empire which has proclaimed itself an independent nation, and is asserting and maintaining its claim to independence by arms."

Both in this observation and in the question certified the word " people " is construed in the sense for which we are contending, and no better definition of it can be made than that given by the Chief Justice. It applies to a foreign power or " the rights of part of a foreign empire which asserts and is contending for its independence."

The Chief Justice observes further that " the rights of a part of a foreign empire, which asserts and is contending for its independence, and the conduct which must be observed by the courts of the Union towards the subjects of such section of an empire who may be brought before the tribunals of this country, are equally delicate and difficult. . . . They belong more properly to those who can declare what the law shall be; who can place the nation in such a position with respect to foreign powers as, to their own judgment, shall appear wise; to whom are entrusted all its foreign relations, than to that tribunal whose power as well as duty is confined to the application of the rule which the legislature may prescribe for it. In such contests a nation may engage itself with the one party or the other; may observe absolute neutrality; may recognize the new state absolutely, or may make a limited recognition of it. It may be said generally, that if the government remains neutral and recognizes the existence of a civil

war, its courts cannot consider as criminal those acts of hostility which war authorizes and which the new government may direct against its enemy. To decide otherwise would be to determine that the war prosecuted by one of the parties was unlawful, and would be to arraign the nation to which the court belongs against the party."

He concluded that persons or vessels employed in the service of " a self-declared government," acknowledged to be maintaining its separate existence by war, must be permitted to prove the fact of their being actually employed in such service by the same testimony which would be sufficient to prove that such vessel or person was employed in the service of an acknowledged state.

" Any colony, district or people " are thus made to refer to a self-declared government or unrecognized state or portion of an established empire asserting its claim to independence by arms. *United States* v. *Palmer*, 3 Wheat. 610.

The Chief Justice also declared " that the title of an act cannot control, but may furnish some aid in showing what was in the mind of the legislature."

That the provision we have been considering only applies to recognized public war and the duty of neutrality as towards foreign powers and belligerents, clearly appears when we examine the history of this legislation, executive and legislative.

On December 26, 1816, the South American wars then raging, President Madison communicated to Congress the following message:

" It is found that the existing laws have not the efficacy necessary to prevent violations of the obligations of the United States as a nation at peace *towards belligerent parties,* and other unlawful acts on the high seas, by armed vessels equipped within the waters of the United States.

" With a view to maintain more effectually the respect due to the laws, to the character, and to the neutral and pacific relations of the United States, I recommend to the consideration of Congress the expediency of such further legislative provisions as may be requisite for detaining vessels actually equipped or in a course of equipment with a warlike force

within the jurisdiction of the United States; or, as the case may be, for obtaining from the owners or commanders of such vessels adequate securities against the abuse of their armaments, with the exceptions in such provisions proper for the cases of merchant vessels furnished with the defensive armaments usual on distant and dangerous expeditions, and of a private commerce in military stores permitted by our laws and which the law of nations does not require the United States to prohibit." Annals of Cong. 14th Cong. 2d sess. 1079, 1080.

On January 1, 1817, Mr. Forsyth, the chairman of the Committee on Foreign Relations, afterwards Secretary of State, addressed a letter to Mr. Monroe, then Secretary of State, as follows:

" I am instructed by the Committee on Foreign Relations to inquire what information has been given to the Department of State of violations or intended violations of the *neutral obligations* of the United States to *foreign Powers* by the arming and equipment of vessels of war in our ports; what prosecutions have been commenced under the existing laws to prevent the commission of such offences; what persons prosecuted have been discharged, in consequence of the defects of the laws now in force, and the particular provisions that have been found insufficient or for the want of which persons deserving punishment have escaped." Annals of Cong. 14th Cong. 2d sess., 1080.

This letter was written in order to obtain the information requisite for the framing of the proper amendments to existing law, in pursuance of the President's message, which had been referred to the committee.

From the passages underscored it is seen that the mind of Congress and of the Executive was solely directed to prevent violation of the obligations of the United States as a neutral towards " belligerent parties," as mentioned in the message of the President, or " foreign powers," as mentioned in the letter of Mr. Forsyth.

The Secretary of State on January 10, 1817, communicated documents bearing on the inquiry of the Committee on For-

eign Relations.  Among these was a communication from the district attorney of Louisiana giving "an enumeration of the cases in which individuals have been prosecuted for infringing or attempting to infringe our neutrality in aid of the governments of New Spain, and in which vessels have been seized and libelled under the act of the 5th of June, 1794" (*Ib.* p. 1082).

On January 14, 1817, .Mr. Forsyth, from the Committee on Foreign Relations, reported a bill defining our neutral obligations as to fitting out of cruisers more fully than had been done in the previous act of 1794, but which still retained the words "prince or state."  Annals of Cong. 14th Cong. 2d sess., 477.

The debate in the House on the bill for enforcing neutrality was extensive, and exhibits the clear understanding of Congress that the amendments were for the purpose of preventing aid to the South American provinces, then recognized belligerents, and that the provision as to fitting out of vessels was intended solely to prevent such aid in this country to foreign powers at war as would violate our neutral obligations.

It was developed that strong pressure had been brought to bear upon our Government to strengthen the neutrality law in order to prevent the South American colonies from obtaining necessary aid here, and preventive measures were suggested by the Spanish minister.

The only objections to the bill were founded on the allegation that it went too far in the enforcement of our neutral obligations towards belligerents.  It was, indeed, contended by Mr. Randolph that the doctrine of neutrality had no application to the case, because one party was not recognized by this Government as independent.

He was answered by Mr. Clay, who said:

"Whenever a war exists, whether between two independent states or between parts of a common empire, he knew of but two relations in which other powers could stand towards the belligerents.  The one was that of neutrality and the other that of a belligerent.  He hoped the gentleman from Virginia did not mean to contend (what would seem to be a conse-

quence of his opinion) that we were a party to the war and an ally of Old Spain against her colonies.

"Being then in a state of neutrality respecting the contest and bound to maintain it, the question was whether the provisions of the bill were necessary to the performance of that duty.

\*     \*     \*     \*     \*

"Gentlemen have contended that this bill ought to be considered as intended merely to enforce our own laws — as a municipal regulation having no relation to the war now existing. It was impossible to deceive ourselves as to the true character of the measure. Bestow on it what denomination you please, disguise it as you may, it is a law, and will be understood by the whole world as a law to discountenance any aid being given to the South American colonies in a state of revolution against the parent country." Annals of Cong. 14th Cong. 2d sess., 741, 742.

In answer to Mr. Clay, Mr. Calhoun expressed in common with other gentlemen his good wishes for the cause of the South American colonies against the mother country, but that such wishes would never influence him to permit a violation of our neutral obligations.

He alluded to the nature of the contest existing in the Spanish provinces, acknowledged that its analogy to our own situation in 1776 enlisted our sympathies, but all that could be expected of us by the patriots was that we, being neutral, should do nothing to weaken their efforts or injure their cause.

On a later occasion he remarked that the law of 1794 had contemplated a war between two independent powers, not one between a mother country and its colonies; and if the defect of that law could not preserve our neutral character in the war now existing in the South he was willing to adopt the remedy. Ib. 747, 752.

Mr. Lowndes said:

"The law of 1794, applying only to the case of war between two independent states, it ought, no doubt, to be extended to comprehend the contest referred to between Spain and her

colonies, and not, when prosecutions are carried up to court for breaches of the law, deny that redress we profess to give. It appeared to him, by some inadvertence, however, the committee had not gone far enough in amending the act of 1794, if it be amended so as to apply to governments not acknowledged to be independent," etc. *Ib.* 755.

The bill, as it passed the House, contained the words "colony, district or people," in addition to the words "prince or state." *Ib.* 768.

In this form it was adopted by the Senate and became a law, with an amendment not here material. *Ib.* 205.

The court will notice that the act of March 3, 1817, 3 Stat. 370, is entitled "An act more effectually to preserve the neutral relations of the United States." This act deals entirely with the fitting out or employment of armed cruisers of war.

Those amendments were urged upon our Government by Spain as necessary, in order to include the South American wars, "for the purpose of putting a stop to the armaments making in different parts of the Union, in violation of the law of nations and of the treaty existing between his Catholic Majesty and this Republic." Chevalier de Onis, Spanish minister, to the Secretary of State, February 28, 1817.

Soon after the bill became the law of 1817, as early as March 15, 1817, the Secretary of State wrote to the Spanish minister, and by direction of the President enclosed a copy of the act "by which the President trusts that the Spanish government will perceive a new proof on the part of the United States of a desire to cultivate friendly dispositions towards Spain." Amer. State Papers, 4 Foreign Relations, 188, 189; 3 Whart. Int. Dig. 560, § 396.

The declarations of the Executive show that from the beginning of the South American revolutions they had been recognized as belligerents by this country.

President Monroe, in 1817, sent a message to Congress in which he said :

"*Through every stage of the conflict* the United States have maintained an impartial neutrality, giving aid to neither of the parties in men, money, ships or munitions of war.

They have regarded the contest not in the light of an ordinary insurrection or rebellion, but as a civil war between parties nearly equal having as to neutral powers equal rights."

In 1836 Mr. Gorostiza, the Mexican minister, complained to our government that the Texans were being treated as belligerents, although he said the Texan movement " had not yet arrived at the point which those of the Spanish Americans had attained when the United States allowed them the same right."

He cites the principles announced by Mr. Monroe, in his message of March 8, 1822, in which he says:

" The United States have acknowledged the rights to which they (the Spanish provinces) were entitled by the law of nations, and as belligerents, so soon as their movement had assumed such a steady and consistent form as to render their ultimate success probable, and from that period they had been permitted to enter with their vessels of war into the ports of these United States," etc.

From this the minister inferred that until such movement had acquired such a steady and consistent form as to render probable the ultimate success of the said provinces in their struggle against Spain, the United States neither acknowledged their possession of any rights as belligerents nor admitted their vessels in the American ports.

He concludes there was a great interval between the commencement of the movement and the period at which it could have acquired the steadiness and consistency deemed requisite. Message of the President, H. R. Doc. 105, 24th Cong. 2d sess. p. 136.

In answer to this communication Mr. Forsyth the Secretary of State declined, in the name of the President, to allow the seizure of the Texan vessel or otherwise molest her. He said that such course " was in accordance with the principles in practice which have been invariably observed by this Government from the first breaking out of the revolution among the Spanish provinces on this continent to the present time."

It is obvious, he says, " that the exclusion of the vessels of the one party from the ports of the United States and the

admission of those of the other would be inconsistent with
an impartial neutrality, and yet the President, in the same mes-
sage from which Mr. Gorostiza has quoted, states that ' through
the whole of this contest the United States have remained
neutral, and have fulfilled with the utmost impartiality all
the obligations incident to that character.'   In a previous mes-
sage of December 7, 1819, he observes, ' In the civil war existing
between Spain and the Spanish provinces in this hemisphere
the greatest care has been taken to enforce the laws intended
to preserve an impartial neutrality. Our ports have continued
to be equally open to both parties and on the same conditions.'
This language plainly refers to the whole of the contest, and
the President is not to be understood in his subsequent mes-
sage, to which Mr. Gorostiza has referred, as intending to say
that the vessels of either party were only permitted to enter
the ports of the United States from the period when the suc-
cess of such party appeared to be probable.   The construction
which Mr. Gorostiza has given to the particular passage he
has cited is not only contradicted by other passages from the
messages of the same executive officer, but still more strongly,
if possible, by the uniform acts of this government in that
and similar cases.   It is a well-known fact that the vessels of
the South American provinces were admitted into the ports
of the United States under their own or other flags from the
commencement of the revolution, and it is equally true that
throughout the various civil contests that have taken place at
different periods among the states that sprung from that
revolution the vessels of each of the contending parties have
been alike permitted to enter the ports of this country.   It
has never been held necessary, as a preliminary to the exten-
sion of the rights of hospitality to either, that the chances of
the war should be balanced, and the probability of eventual
success determined.  For this purpose it has been deemed suf-
ficient that the party had declared its independence and at the
time was actually maintaining it.  .  .  .  The exclusion of
the vessels of Texas while those of Mexico are admitted is not
deemed compatible with the strict neutrality which it is the
desire and the determination of this government to observe

in respect to the present contest between those countries."
H. R. Doc. 105, 24th Cong. 2d sess. 141, September 30, 1836;
1 Int. Law Dig. sec. 69, p. 509.

The declarations of the department charged with our for-
eign relations state the historical facts upon which the legis-
lation now under review is largely dependent, and which were
the inspiration for its enactment.

Such was the actual condition of the foreign relations of
this country when the neutrality act was amended, in 1817,
as to armed cruisers, by inserting words which would cover
every form of recognized war then being waged by colo-
nies or dependencies for independence. Every such contest
was covered and described, either by the words a prince, a
state, a colony, a district or a people, each of these ex-
pressions being used to designate some *de facto* power or bel-
ligerent.

Between such contestants, our government declared it
would enforce neutrality, and would allow neither to fit out
war vessels in our ports.

It is not strange that Congress should not have contem-
plated an enforcement of a neutrality provision except in a
case where there were belligerents. It could not suppose
that ships of war would be fitted out in our ports when there
was no recognized war, or that our Government would sup-
port a fiction by refusing to recognize a state of war and yet
enforce measures only applicable to such a state.

It was natural to assume that if a civil war should ever
break out on the American continent the United States would
recognize it as such and place both parties on an equal level
as regards the enforcement of neutrality.

In *The Santissima Trinidad*, 7 Wheat. 337, the policy of
the United States is thus declared :

"The government of the United States has recognized the
existence of a civil war between Spain and her colonies and
has avowed her determination to remain neutral between the
parties. Each party is therefore deemed by us a belligerent
nation, having, so far as concerns us, the sovereign rights of
war."

The enforcement of neutrality, in so far as we have been considering it, has been in accordance with these views.

In the case of Texas, its belligerency was recognized from the time the declaration of independence was announced, which was contemporaneous with the outbreak of the revolution.

That the provision regarding arming and fitting out cruisers in our ports, as originally enacted in 1794, had in view only restrictions of neutrality and applied to belligerent powers alone cannot be doubted.

This provision was directed principally against the practices of Genest, acting on behalf of the French government, during the wars then raging in Europe:

Its origin is clearly traced :

" The practice of commissioning, equipping and manning vessels in our ports to cruise on any of the belligerent parties is equally and entirely disapproved, and the Government will take effectual measures to prevent a repetition of it." 3 Jeff. Works, 105 ; 4 do. 34.

The keynote to this legislation is found in President Washington's message, December 3, 1793, in which he says :

" The original arming and equipping of vessels in the ports of the United States by any of the belligerent parties for military services, offensive or defensive, is deemed unlawful."

Mr. Wharton treats the provision under the head of " Issuing of belligerent cruisers," and the proposition which he announces as the result of the legislation is that the United States is " bound to restrain fitting out and sailing of armed cruisers of belligerents." 3 Wharton's Int. Law Dig. 551, § 396.

In an opinion delivered in 1841, Mr. Legaré declares " the object of the act of 1818 (same in act of 1817) was to prevent all equipping of vessels of war in our ports for a foreign power actually engaged in hostilities with a nation with which the United States are at peace, knowing the purpose for which they are to be employed." 3 Op. Att'y Gen. 738.

But reliance is placed, as we understand, upon the proclamations of the President during the present disturbances in Cuba as making the " insurrection sufficiently notorious and

extensive to have received the attention of the Government of this country for nearly two years past, although the insurgents have not received any recognition of belligerency."

These proclamations do not lend countenance to the present position of the Government, for they do not recognize a public war existing in Cuba, much less a government or new power asserting its sovereignty.

" Civil disturbances," which may proceed from factions, can hardly be deemed the equivalent of a public war, or to constitute those participating in them " a people," in view of the construction placed upon this expression in the judicial and political declarations of this country.

If the argument of appellant is correct, there results a condition opposed to the very conception of neutrality, for the courts would be obliged to say that those causing civil disturbance constitute " a people" for the purpose of punishment under the act, and yet would be obliged to deny to them their standing as such under the neutrality laws, because the political departments of the Government have not recognized their belligerency or political existence.

Spain would obtain all the advantages of neutrality without incurring any of its obligations; it would be the enforcement of a simulated neutrality, a neutrality in name only, as it would be entirely in her favor.

It would enable Spain to proceed against those opposing her in Cuba as engaged in civil commotion only, while calling upon this nation to assist her by enforcing a neutrality provision applying to public war waged by a belligerent.

The court can hardly treat the expressions in the President's messages as a political declaration of the existence of a colony, a district or a people at war with Spain, and how can the insurgents be declared by the court to constitute " a people" without some such declaration?

If the proclamations can be resorted to by courts as evidence of a status possessed by the insurgents, for one purpose, they must be equally available as establishing such status for all purposes of neutrality. It would not be fair to hold that these documents contain a sufficient declaration of the exist-

ence of "a people" for the purpose of punishing those who act here in their service, but not sufficient to constitute "a people" entitled to the rights of neutrality under our laws. The court will not close its eyes and open them again to suit the pleasure of the Government for the time being.

The Government places much reliance upon the opinion of Attorney General Hoar as to the construction of the neutrality clause in question.

This opinion is thus stated by Mr. Wharton:

"The neutrality act of 1818 is not restricted in its operation to cases of war between two nations or where both parties to a contest have been recognized as belligerents — that is, as having a sufficiently organized political existence to enable them to carry on war. It would extend to the fitting out and arming of vessels for a revolted colony whose belligerency had not been recognized, but it should not be applied to the fitting out, etc., of vessels for the parent state for use against a revolted colony whose independence had not in any manner been recognized by our government." 3 Whart. Int. Law Dig. 628, § 402.

The question before the Attorney General was different from the one now presented to the court.

The point submitted was whether proceedings could be taken under the act against Spanish vessels fitted out in this country, on the ground that they were procured to be fitted out and armed with intent that they should be employed in the service of Spain, a foreign state, with intent to cruise or commit hostilities against the subjects, citizens or property of a "colony, district or people" with whom the United States were at peace, namely, a "colony, district or people" claiming to be the Republic of Cuba. It was held that in the absence of any political recognition of such a state the courts must conform to the action of the Government.

It was further held that Spain could not be said to commit hostilities against any party by procuring armed vessels for the purpose of enforcing its own recognized authority within its own dominions.

Here is an admission that the hostilities were not against "a people."

The attention of the Attorney General was called to the fact that libels had been filed to procure the condemnation of vessels on the ground that they were being fitted out and armed with intent to be employed in the service of a "colony, district or people," viz., the "colony, district or people of Cuba," and it was argued that as the Government in those libels had asserted that Cuba was a "colony, district or people" capable of committing hostilities against Spain, the law equally applied to an armament procured or fitted out by Spain for the purpose of hostilities against Cuba.

This proposition the Attorney General denied.

We do not feel called upon to enter into the question of the soundness of the opinion.

In the present case there is no allegation that Cuba as a "colony, district or people" has arisen against Spain.

The case before the Attorney General involved the assertion of a pretended government, claiming to be the Republic of Cuba, and therefore might well be said to come within the act as a "colony, district or people."

The argument of inconvenience is made.

It is said that if under the present condition of affairs proceedings cannot be had against vessels under section 5283, there is no penalty provided by law. This argument, as remarked in the court below, was as applicable under the original act of 1794 as it is now, under the act of 1818, reënacted in section 5283, Revised Statutes.

Under the first act it was held, as we have seen, that the words "foreign prince or state" did not embrace sections of an empire not recognized by the United States.

In order to cover such cases, Congress resorted to additional legislation.

It was not supposed that the courts by any argument *ab inconvenienti* could so stretch the act as to cover such cases.

The result was the act of 1817, which added words to cover sections of an empire which had separated, or were endeavoring to separate, from the mother country.

There are ample provisions of municipal law to punish those who set on foot enterprises for the purpose of committing hostilities against a power with which we are at peace.

Section 6 of the act of 1818 (3 Stat. 448), reënacted in section 5286, Revised Statutes, prohibits military enterprises to be carried on from "thence against the territory or dominions of any foreign prince or state, or of any colony, district or people with whom the United States are at peace."

This section, as we have seen, provides fully for offences against the peace of a foreign state, including enlistments.

It applies as well in times of peace as in times of war. There is no requirement that the expedition or enterprise should be in the service of any government or "people."

It is only necessary that it should be directed against the territory or dominions of a "people."

This use of the words "any people" conclusively shows that in the sense of Congress it meant a power exercising or asserting dominion, and is therefore of great significance in the argument.

Under this clause no forfeiture is provided.

For any offences committed at sea amounting to piracy under our laws, those laws provide ample penalties.

But if at any time Spain should think it necessary for this country to enforce its law regarding the fitting out of belligerent cruisers, the remedy is in her own hands; she has but to recognize a state of war.

This has always been determined by our Government.

Neither the United States nor Spain admits there exists a state of belligerency, and in its absence there cannot exist any obligations of neutrality.

In preparing the Foreign Enlistment Act of 1819, taken from our act, Parliament added to the language of our statute, "or part of any province or people or of any person exercising or assuming to exercise any powers of government in or over any foreign state, colony, province or parts of any province or people." 59 George III, c. 69, 7.

This additional language was undoubtedly inserted in view of the pronounced object of the language of the amendatory

acts of 1817, 1818, as applying only to an empire or sections of an empire, and in view, also, of the construction of the word "people" by our decisions and in the light of the English case of *Nesbitt* v. *Lushington, supra,* defining the meaning of the same expression.

In the case of *The Itata,* in some respects similar to the present controversy, the District Court of the United States for the district of California, in an opinion, said as follows:

"Prior to the passage of the act of April 20, 1818, the Supreme Court of the United States, in the case of *Gelston* v. *Hoyt,* 3 Wheat. 245, speaking through Mr. Justice Story, held that section 3 of the act of 1794, prohibiting the fitting out of any ship, etc., for the service of 'any foreign prince or state,' to cruise against the subjects, etc., of any foreign prince or state with which the United States were at peace, did not apply to any new government unless it had been recognized by the United States or by the government of the country to which such new country belonged, and that a plea which set up a forfeiture under that act, in fitting out a ship to cruise against such new state, must aver such recognition, or it is bad.

"Congress, in passing the subsequent act of April 20, 1818, by which the provision referred to of the act of 1794 was, in substance, reënacted, must be presumed to have known the construction that had been theretofore put by the Supreme Court upon the words 'prince or state' in the act of 1794, and with that knowledge in passing the act of 1818 inserted in the same clause the words 'colony, district or people.' This was done, according to Dana's Wheaton, sec. 439, note 215, and 1 Whart. Int. Dig. p. 561, upon the suggestion of the Spanish minister that the South American provinces then in revolt and not recognized as independent might not be included in the word 'state.' But in every one of those instances the United States had acknowledged the existence of a state of war and, as a consequence, the belligerent rights of the provinces." 49 Fed. Rep. 646. Affirmed on Appeal, 56 Fed. Rep. 505.

No attempt was made by the Government to obtain a review of either of these decisions.

President Harrison was of opinion that the matter was a proper one to call to the attention of the legislature. In his message, December 9, 1891, he said:

"A trial in the District Court of the United States for the Southern District of California has recently resulted in a decision holding, among other things, that, inasmuch as the party offending had not been recognized as a belligerent, the acts done in its interest could not be a violation of our neutrality laws. From this judgment the United States has appealed, not that the condemnation of the vessel is a matter of importance, but that we may know what the present-state of our law is, for, if this construction of the statute is correct, there is obvious necessity for revision and amendment."

There have been several cases decided in the District Courts involving the condemnation of vessels where the question as to the application of the statute was not raised or discussed by the court. *United States* v. *Mary M. Hogan ;* Brown, Justice, 18 Fed. Rep. 529; *United States* v. *214 Boxes*, etc., 20 Fed. Rep. 50; *The City of Mexico*, 28 Fed. Rep. 148.

The same judge who decided the first case also decided that of *The Carondelet*, 37 Fed. Rep. 799.

There the question was much discussed, and although the libel was dismissed on a different ground, the judge leaves no doubt as to his views. The question was whether a vessel entering the service of the faction under Hippolyte, in Hayti, which had not been recognized, could be said " to enter the service of a foreign prince or state, or of a colony, district or people, unless our Government had recognized Hippolyte's faction as at least constituting a belligerent, which it does not appear to have done."

The judge remarked that the statute was a highly criminal and penal one; that it was not to be enlarged by construction beyond the fair import of its terms.

In *United States* v. *Hart*, the same judge said:

"Section 5283 deals with armed cruisers, designed to commit hostilities in favor of one foreign power as against another foreign power with whom we are at peace." 74 Fed. Rep. 724.

In the case of *The Conserva*, 38 Fed. Rep. 431, Judge Benedict held that the language of section 5283, Revised Statutes, as to the commission of hostilities against the subjects, citizens or property of a foreign prince or people, did not include factions engaged in insurrection who were not recognized by the United States as belligerents.

The question was whether the section applied, as neither Hippolyte nor Légitime, who were struggling for supremacy in Hayti, had been recognized by our Government as belligerent powers.

"In the absence of proof of that fact, the fitting out of a vessel with intent to enter the service of one to commit hostilities against the other is not brought within the scope of the statute."

It is said that the history of the act tends to show "that it was intended to cover every revolutionary body, recognized or unrecognized, which made *bona fide* claims to rights of sovereignty."

But where is it shown in this record that there exists "a revolutionary body claiming the rights of sovereignty"?

A good deal has been said about a "recognition of insurgency" as distinguished from a recognition of belligerency. I think this is the first time in any court of justice that such a distinction has been made. The expression, "recognition of insurgency," is not found in the works of any of the accepted writers on international law, nor is it a part of our jurisprudence. It has been used by Dr. Wharton in a paper which he contributed to a law magazine. The only meaning he attaches to the expression, is that the Government when it sees that certain persons are insurgents, may refuse to treat them as pirates. The court is now asked to enforce a provision regarding the fitting out of belligerent cruisers, a strictly neutrality provision, where there is no neutrality, no recognized war. Our Government is going further than Spain has ever admitted and further than she is willing to go. Our Government here insists that there is a war, that there is a hostile sovereignty in Cuba, and that the people of Cuba as "a people" are in revolt against Spain. The Government, in

effect, says to Spain : We will enforce neutrality in your favor, but not in favor of the other party which we now assert to be " a people." This argument admits our obligations to Spain are just the same under the present conditions, when that Government does not admit there is a war, as if there was belligerency. This is a great responsibility for the Government to take, and a great responsibility for this court to declare.

*Mr. A. W. Cockrell* for appellees.

The act of arming, etc., a vessel is punishable only when that act of arming, etc., done as therein provided, is accompanied by the intent, imputed to the person or persons therein specified, of doing the thing therein provided against. Is it not idle to say that the vessel may be forfeited, under this statute, for the acts or doings, therein specified; dissociated from the intent therein imputed to the persons therein specified ? If it be that the acts and doings therein specified must be accompanied with the intent therein specified before persons can be punished thereunder, it follows the vessel cannot be condemned to forfeiture otherwise than upon allegations and proof showing those acts and doings, and allegations and proof showing the intent, therein denounced, with which they were committed.

Under any other construction, a vessel may be condemned to forfeiture, upon allegations and proof, short of those required to punish the offending persons. Whereas, the plain, imperative, unambiguous language of the statute, is " And every such vessel," etc.; that is, a vessel in respect of which these acts and doings have been committed; a vessel, in respect of the arming of which, this intent existed; and, equally and alike, a vessel in respect of which, the intent of the offending persons therein denounced has been ascertained by their conviction thereof.

Condemnation to forfeiture is not, by the law-making power, predicated of any other vessel, than such vessel. Forfeiture is denounced against a vessel so fitted out and armed, with the

intent therein specified, by the offending persons so fitting her out; and of which acts and doings with such intent, the offending persons have been convicted; and forfeiture is denounced against no other than "such" vessel.

In seeking, under this libel, to make a case of forfeiture, independently of and without reference to the ascertained guilt of the offending persons, the Government insists that the vessel identified by the statute as such vessel, means the vessel so fitted out and armed with the intent denounced, but not a vessel in respect of whose fitting out and arming offending persons have been convicted; because, speaking through the learned District Attorney, it said, and was logically forced to say, the vessel may be liable to condemnation, under this statute, and the offending persons acquitted.

Under the statute, upon which this libel is based, no wrong doing in which the vessel is made the guilty instrument, is required to consummate the forfeiture. The guilty intent of the offending person is attached by the mandate of the statute to the vessel, and forfeiture is denounced because of this guilty intent. The original act, § 3, c. 50, act of June 5, 1794, lends strong support to the contention of claimants. In the structure of the section as originally passed, the language condemning the vessel to forfeiture, following upon the ascertained guilt of the offending person, was not separated from such ascertainment by the intervention of a semi-colon.

In the case of *Gelston* v. *Hoyt*, 3 Wheat. 246, it was argued, in this court, in March, 1817, by Mr. Hoffman and Mr. D. B. Ogden, for defendant in error, that "By every just rule of construction the proceeding by indictment against the offender and his conviction must precede the suit *in rem* and the forfeiture of the vessel. The phraseology of the act is different from all other statutes. By those statutes, the revenue officers have power to seize and proceed *in rem* against the thing seized as forfeited, independent of any criminal proceedings against the offending individuals. By this act the forfeiture of the thing is made to depend upon the conviction of the person, and the President alone has power to seize, and that only as a precautionary measure, to prevent an intended violation

of the laws." The case stood over for reargument, and was reargued February 23d, and decided February 27th, 1818. The act in its present form was enacted April 20th, thereafter, and although the argument of these gentlemen prevailed on other propositions hereinafter discussed, and the court was not required to pass upon this special contention, it could not have escaped the attention of the Congress when in April, 1818, this statute was subjected to revision. If, in this revision, Congress had purposed to authorize a seizure and forfeiture of the thing, independent of any criminal proceedings against offending individuals, it was its duty to have recast the phraseology of the statute and put it in harmony with other statutes empowering revenue officers to seize and proceed *in rem* against the thing seized for forfeiture.

The libel excepted to, not only fails to allege that the necessary criminal intent of the offending persons has been in anywise ascertained; it does not even show who the offending persons are.

The language of the statute clearly shows that the act of arming must be accompanied with the specific intent therein denounced, to consummate the offence. It follows the specific intent must be laid in the identical persons, and none other, so fitting out the vessel.

The word "people," as used in this statute, was defined in *United States* v. *Quincy,* 6 Pet. 445, to be merely descriptive of the power in whose service the vessel was intended to be employed; and it is one of the denominations applied by the act of Congress to a foreign power.

It follows that the word, "colony," and the word, "district," each is, also, descriptive of the power in whose service the vessel is to be employed; each is, also, one of the denominations applied by the act of Congress to a foreign power. It is equally clear that the added words, "colony, district or people," do not mean a part of a colony, a part of a district, or a part of a people or many people. They mean a colony, district or people, constituting a body politic, that is charged with recognized political power, a foreign power.

That it had been attempted to import into section 5283,

the effect given to sec. 7 of the Foreign Enlistment Act, 59. George III, in the numerous cases, and the discussions thereof, arising thereunder, could not, it is presumed, have escaped the attention of the Supreme Court; the *Itata case* had been before it on application for a writ of *certiorari;* nor was this court unaware of the recommendations of President Harrison to Congress based on the decision of the *Itata case;* nor was it unaware that the Congress had failed to respond to those recommendations, when in May, 1896, in the *Wiborg case,* 163 U. S. 632, it analyzed the sections grouped under the title Neutrality Laws.

It is apparent that this court in the *Wiborg case* brought in opposition and contrast the eleven sections from 5281 to 5291, for the purpose of defining and ascribing to each its appropriate functions in the statutory system thereby enacted, and declared that "section 5283 deals with fitting out and arming vessels in this country in favor of one foreign power against another foreign power with which we are at peace."

The court, after this analysis of the sections commented on, proceeds to set forth in terms section 5286, under which Wiborg was indicted. And in the analysis of this section, the court makes it apparent, from its terms as contrasted with section 5283, theretofore quoted also at length, that section 5286, while its general purpose " was undoubtedly designed to secure neutrality in wars between two other nations, or between two contending parties recognized as belligerents, its operation is not necessarily dependent on the existence of such state of belligerency."

That this language applies to section 5286, and not to section 5283, is obvious not only from the context, but also because section 5286 was the only section under consideration. Its meaning and application of the facts under consideration were to be ascertained by reference to the statutory system as a whole; and the court demonstrated, that though this section was placed under Title LXVII, headed neutrality, and though it did tend to secure neutrality in wars between foreign powers or recognized belligerencies, its operation was not necessarily dependent on such a recognized state or status of

belligerency. And the court enforces this reasoning by reference to its language following as it does the recommendations of President Washington.

*Mr. Attorney General* for the United States.

In view of the hour [it was then past the usual time for adjournment], I will not make an extended argument. A few remarks upon the illustrations made by Mr. Phillips will serve to bring out the difference between my position, as I understand it, and my position as put by him.

Before doing this, however, I call your Honor's attention to the exact form of the entry of the judgment below : that if the libel be not amended within ten days the same stand dismissed.

The counsel on the other side contend that the United States Attorney had to wait ten days before deciding whether he wanted to amend or not. We say that he could immediately state to the court that he did not wish to amend, and that by appealing he did so state, and that the libel thereby was dismissed.

It is also contended that the libel should have been dismissed because it was brought before the successful prosecution of the persons who had fitted out and armed the vessel. It seems to be plain upon the very reading of the statute that two penalties are to follow from a certain act; first, that every person who shall, within the limits of the United States, fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or shall knowingly be concerned in the furnishing, fitting out or arming of any such ship or vessel, with intent that such ship or vessel shall be employed in the service of any foreign prince or state or of any colony, district or people, to cruise or commit hostilities, shall, upon conviction, be adjudged guilty of a high misdemeanor, and shall be fined and imprisoned : and, secondly, every such ship or vessel shall be forfeited — not upon the conviction of the offending person, but upon the doing or procuring to be done the acts.

The counsel who first addressed the court on the other side,

in speaking of the old insurance case of *Nesbitt* v. *Lushington*, 4 T. R. 783, supposed the case of a ship which was insured under a policy containing a provision for insurance against "restraints and detainments of all kings, princes and people." A moment's attention to this case will illustrate the exact point here under discussion.

I am not willing to admit, in view of the amendment made to the act of 1794, by adding to the words "prince and state," which covered every form of organized government, the words "colony, district or people," and in view of the historical facts attending that amendment, that the language of our statutes is to be governed by the rules of construction applicable to such policies of insurance.

But, assuming for the purpose of what I have to say, that the question of what are "a people" would be the same under our statute as it would be under a policy of insurance such as was involved in that case, here are the facts involved in *Nesbitt* v. *Lushington*. It appeared in evidence that a ship was forced, by stress of weather, into Elly Harbor, in Ireland. There happening to be a great scarcity of corn there at that time, the people came on board the ship in a tumultuous manner, and took the government of her from the captain and crew, and weighed her anchor, by which she drove on a reef of rocks, where she stranded; and they would not leave her until they had compelled the captain to sell all the corn except about ten tons, at a certain rate, which was about three fourths of the invoice price.

Now, what picture does that present? It presents no picture of an attempt to set up a government, or even of an attempt to overthrow an existing government, save in so far as the act which they did was lawless, and therefore in temporary defiance of the laws of the government which had jurisdiction there.

But suppose the same ship landed upon a point on the coast of Cuba, where General Gomez or any other Cuban leader was in control, and the vessel had been seized and her cargo confiscated for the support of the insurgent forces. Would that present the same case as the case in the 4th Term

Reports? No. What is the difference? The Irish case had no political significance. The people wanted something to eat. The uprising was a temporary one, which would be terminated when hunger was appeased. What is the other? The President of the United States, in language which has already been read to your Honors, describes them thus, in his annual message of 1895: "Whatever may be the sympathy of our countrymen, as individuals, with a people who seem to be struggling for larger autonomy and greater freedom." That is what this people in Cuba are doing. There lies the distinction between that case and this, and there lies the application of the rule "*noscitur a sociis.*" The old statute declared that any one who equips, or causes to be equipped, a vessel to commit hostilities against the subjects or property of a "prince or state" with whom or which the United States are at peace, should be punished. I admit that Congress, when it adds other words, is proceeding in the same line — that when it says "colony, district or people," it refers to other political associations — not to hungry mobs. It is not associations of individuals, wandering at large over an island; it is not a mob, without political purpose; but an organization which, successfully or unsuccessfully, rightfully or wrongfully, is attempting, with the knowledge of the whole world, to set up a government.

The words, "subjects, citizens or property of a people," indicate the objects of the hostilities. Any political organization which has, partly or wholly, authority over any part of the land, however narrow or however temporary, comes within the description of this law, because its objects are political. They are in less degree as to permanency of organization, as to extent of dominion, or as to permanent control, the same as a "prince" or "state."

The libel charges that the vessel was fitted out to be employed in the service of a people then engaged in armed resistance to the government of the King of Spain in the Island of Cuba, to cruise and commit hostilities against the subjects, citizens and property of the King in that island. This distinguishes this case from the corn seizure on the coast of Ireland.

Mr. Attorney General's Argument for the United States.

W.hen men resist the regular authority of the country in which
they dwell, they do it for one of two purposes : for the purpose
of robbery, rapine or lawlessness, or in order to set up another
government.  If they do it for the former purpose, they are
robbers on the land and pira*ᵃˢ on the sea.  If they do it for
the latter purpose, they are " ᵢstrict," if you speak of them
with reference to the territory they occupy; "a colony," if
you speak of them with reference to their origin ; and "a peo-
ple," whether many or few, if you speak of them with refer-
ence to their mere character.

I do not claim that there is no middle ground between a
political organization and a band of robbers or pirates.  I say
that is the distinction by land and sea.  No one has a right
to use force  against persons, property or vessels of any nation,
without some sort of political authority to do so.  It may be
an old, established authority.  It may be merely a recognized
belligerent authority.  It may be the authority of the sacred
right of revolution which some have undertaken to exercise,
without getting far enough along with it in its success or its
permanency, or its points of contact with other nations, to
secure formal recognition.  The world recognizes and the courts
recognize, that in the one case the men are blindly striking
out for what they believe to be their right of governing them-
selves ; in the other case it is recognized that the lawlessness
is without warrant.

The definition that to be a pirate one must be an enemy
of all mankind is a very strange one.  The conclusion from it
would be that if men want to start out to be pirates and con-
fine themselves entirely to robbing British ships, they never
can be punished as pirates.  A pirate would not want any-
thing better than that.

The question is whether there is some kind of a body of
people, whether you describe them as "a district" from their
place of abode ; or as "a colony," having reference to where
they come from ; or as "a people"; or whether they have
got together hurriedly, or been long together with ties of
blood between them.  If they are united by a common
purpose to pull down one government and put up another,

they are "a people."   It seems to be clear that the intention of Congress in adding these words to the statute was to prevent our citizens from taking part in any sort of political enterprise against a friendly power, or its subjects, citizens or property.

This libel charges that this vessel was fitted out with intent to enter the service of a people, to wit: the Cuban insurgents or revolutionists.   Who are they?

The proclamation of the President tells you who they are. They are a body of people down there who are struggling to govern themselves, with or without just reasons for complaint against the government of Spain.   The fact, however, is plain.   We know it not only as matter of general history, but through the Executive Department.   The reasons which determine whether this Government will give them formal recognition have been discussed by my associate.   Right or wrong, the Executive has considered that the reasons existing do not justify formal recognition of their belligerency or independence.

But the actual state of fact, the existence of hostilities which has caused the King of Spain to send two hundred thousand troops to the island of Cuba, the destruction of the property of American citizens which is almost daily called to the attention of the Government, constitutes a condition which confronts us, and, confronted with this condition, the Government is met by these troubles, now centred largely in the District of Florida which, having formerly belonged to Spain, naturally feels inclined to one side of the contest more than the other.

We have found, for the first time, a ship which we could prove was fitted out for warlike purposes.   We are twitted with the fact that this is the first time that this proceeding has been taken.   But this is the first time a ship has set a gun on her deck, so arranged that it could be used from that deck for the purpose of firing upon a vessel of a friendly power. We come into court and ask for the enforcement of this statute.   We are met by the claim that these insurgents are not "a people," because they have not been formally recognized as belligerents or insurgents.   We say that they are a

political organization, which makes them "a people," and that they are engaged in a political enterprise, which alone gives character to the action of the owners of this vessel, and prevents them from being pirates.

*Mr. Calderon Carlisle,* by leave of court, filed a brief as *Amicus Curiœ.*

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

It is objected that the decree was not final, but, inasmuch as the libel was ordered to stand dismissed if not amended within ten days, the prosecution of the appeal, within that time, was an election to waive the right to amend and the decree of dismissal took effect immediately.

In admiralty cases, among others enumerated, the decree of the Circuit Court of Appeals is made final in that court by the terms of section six of the Judiciary Act of March 3, 1891, but this court may require any such case, by certiorari or otherwise, to be certified "for its review and determination with the same power and authority in the case as if it had been carried by appeal or writ of error to the Supreme Court," that is, as if it had been brought directly from the District or the Circuit Court. 26 Stat. 826, 828, c. 517, § 6.

Accordingly the writ of certiorari may be issued in such cases to the Circuit Court of Appeals, pending action by that court, and, although this is a power not ordinarily to be exercised, *American Construction Co.* v. *Jacksonville Railway,* 148 U. S. 372, 385, we were of opinion that the circumstances justified the allowance of the writ in this instance, and the case is properly before us.

We agree with the District Judge that the contention that forfeiture under section 5283 depends upon the conviction of a person or persons for doing the acts denounced is untenable. The suit is a civil suit *in rem* for the condemnation of the vessel only, and is not a criminal prosecution. The two proceedings are wholly independent and pursued in different

courts, and the result in each might be different. Indeed, forfeiture might be decreed if the proof showed the prohibited acts were committed though lacking as to the identity of the particular person by whom they were committed. *The Palmyra*, 12 Wheat. 1, 14; *The Ambrose Light*, 25 Fed. Rep. 408; *The Meteor*, 17 Fed. Cas. 178.

*The Palmyra* was a case of a libel of information against the vessel to forfeit her for a piratical aggression, under certain acts of Congress which made no provision for the personal punishment of the offenders, but it was held that, even if such provision had been made, conviction would not have been necessary to the enforcement of forfeiture. And Mr. Justice Story, delivering the opinion, said : " It is well known, that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the Crown. The forfeiture did not, strictly speaking, attach *in rem;* but it was a part, or at least a consequence, of the judgment of conviction. It is plain from this statement, that no right to the goods and chattels of the felon could be acquired by the Crown by the mere commission of the offence; but the right attached only by the conviction of the offender. The necessary result was, that in every case where the Crown sought to recover such goods and chattels, it was indispensable to establish its right by producing the record of the judgment of conviction. In the contemplation of the common law, the offender's right was not divested until the conviction. But this doctrine never was applied to seizures and forfeitures, created by statute, *in rem*, cognizable on the revenue side of the Exchequer. The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing; and this whether the offence be *malum prohibitum* or *malum in se*. The same principle applies to proceedings *in rem*, on seizures in the Admiralty. Many cases exist, where the forfeiture for acts done attaches solely *in rem*, and there is no accompanying penalty *in personam*. Many cases exist where there is both a forfeiture *in rem* and a personal penalty. But in neither class of cases has it ever been decided that the prosecutions were dependent upon each other. But the practice has been

and so this court understands the law to be, that the proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam*." And see *The Malek Adhel,* 2 How. 210 ; *United States* v. *The Little Charles,* 1 Brock. 347.

The libel alleged that the vessel was "furnished, fitted out and armed, with intent that she should be employed in the service of a certain people, to wit, certain people then engaged in armed resistance to the Government of the King of Spain, in the island of Cuba, to cruise and commit hostilities against the subjects, citizens and property of the King of Spain, in the island of Cuba, with whom the United States are and were at that date at peace."

The learned District Judge held that this was insufficient under section 5283, because it was not alleged "that said vessel had been fitted out with intent that she be employed in the service of a foreign prince or state, or of any colony, district or people recognized as such by the political power of the United States."

In *Wiborg* v. *United States,* 163 U. S. 632, which was an indictment under section 5286, we referred to the eleven sections from 5281 to 5291, inclusive, which constitute Title LXVII of the Revised Statutes, and said : " The statute was undoubtedly designed in general to secure neutrality in wars between two other nations, or between contending parties recognized as belligerents, but its operation is not necessarily dependent on the existence of such state of belligerency," and the consideration of the present case arising under section 5283 confirms us in the view thus expressed.

It is true that in giving a *résumé* of the sections, we referred to section 5283 as dealing " with fitting out and arming vessels in this country in favor of one foreign power as against another foreign power with which we are at peace," but that was matter of general description, and the entire scope of the section was not required to be indicated.

The title is headed " Neutrality," and usually called by way of convenience the " Neutrality Act," as the term " Foreign Enlistment Act " is applied to the analogous British statute, but this does not operate as a restriction.

Neutrality, strictly speaking, consists in abstinence from any participation in a public, private or civil war, and in impartiality of conduct toward both parties, but the maintenance unbroken of peaceful relations between two powers when the domestic peace of one of them is disturbed is not neutrality in the sense in which the word is used when the disturbance has acquired such head as to have demanded the recognition of belligerency. And, as mere matter of municipal administration, no nation can permit unauthorized acts of war within its territory in infraction of its sovereignty, while good faith towards friendly nations requires their prevention.

Hence, as Mr. Attorney General Hoar pointed out, 13 Opinions, 177, 178, though the principal object of the act was " to secure the performance of the duty of the United States, under the law of nations, as a neutral nation in respect of foreign powers," the act is nevertheless an act " to punish certain offences against the United States by fines, imprisonment and forfeitures, and the act itself defines the precise nature of those offences."

These sections were brought forward from the act of April 20, 1818, 3 Stat. 447, c. 88, entitled "An act in addition to the ' Act for the punishment of certain crimes against the United States,' and to repeal the acts therein mentioned," which was derived from the act of June 5, 1794, 1 Stat. 381, c. 50, entitled " An act in addition to the ' Act for the punishment of certain crimes against the United States,' " and the act of March 3, 1817, 3 Stat. 370, c. 58, entitled "An act more effectually to preserve the neutral relations of the United States."

The piracy act of March 3, 1819, 3 Stat. 510, c. 77, Rev. Stat. §§ 4293, 4294, 4295, 4296, 5368, supplemented the acts of 1817 and 1818.

The act of 1794, which has been generally recognized as the first instance of municipal legislation in support of the obligations of neutrality, and a remarkable advance in the development of International Law, was recommended to Congress by President Washington in his annual address on December 3, 1793; was drawn by Hamilton; and passed the Senate by the

casting vote of Vice President Adams.   Ann. 3d Cong. 11, 67.
Its enactment grew out of the proceedings of the then French
minister, which called forth President Washington's proclama-
tion of neutrality in the spring of 1793.   And though the
law of nations had been declared by Chief Justice Jay, in his
charge to the grand jury at Richmond, May 22, 1793 (Whar-
ton's State Trials, 49, 56), and by Mr. Justice Wilson, Mr. Jus-
tice Iredell and Judge Peters, on the trial of Henfield in July
of that year (Id. 66, 84), to be capable of being enforced in
the courts of the United States criminally, as well as civilly,
without further legislation, yet it was deemed advisable to
pass the act in view of controversy over that position, and,
moreover, in order to provide a comprehensive code in pre-
vention of acts by individuals within our jurisdiction incon-
sistent with our own authority, as well as hostile to friendly
powers.

Section 5283 of the Revised Statutes is as follows:

"Every person who, within the limits of the United States,
fits out and arms, or attempts to fit out and arm, or procures
to be fitted out and armed, or knowingly is concerned in the
furnishing, fitting out or arming, of any vessel with intent
that such vessel shall be employed in the service of any for-
eign prince or state, or of any colony, district or people, to
cruise or commit hostilities against the subjects, citizens or
property of any foreign prince or state, or of any colony, dis-
trict or people, with whom the United States are at peace, or
who issues or delivers a commission within the territory or
jurisdiction of the United States, for any vessel, to the intent
that she may be so employed, shall be deemed guilty of a high
misdemeanor, and shall be fined not more than ten thousand
dollars, and imprisoned not more than three years.   And every
such vessel, her tackle, apparel and furniture, together with
all materials, arms, ammunition and stores, which may have
been procured for the building and equipment thereof, shall
be forfeited; one half to the use of the informer, and the
other half to the use of the United States."

By referring to section three of the act of June 5, 1794,
section one of the act of 1817, and section three of the act of

1818, which are given in the margin,[1] it will be seen that the words " or of any colony, district or people" were inserted in the original law by the act of 1817, carried forward by the act of 1818, and so into section 5283.

The immediate occasion of the passage of the act of March 3, 1817, appears to have been a communication, under date of December 20, 1816, from the Portuguese minister to Mr. Monroe, then Secretary of State, informing him of the fitting out of privateers at Baltimore to act against Portugal, in case it should turn out that that Government was at war with the "self-styled Government of Buenos Ayres," and soliciting " the proposition to Congress of such provisions of law as will prevent such attempts for the future." On December 26, 1816, President Madison sent a special message to Congress, in which he referred to the inefficacy of existing laws " to pre-

---

[1] Act of June 5, 1794 : " SEC. 3. That if any person shall within any of the ports, harbors, bays, rivers or other waters of the United States, fit out and arm or attempt to fit out and arm or procure to be fitted out and armed, or shall knowingly be concerned in the furnishing, fitting out or arming of any ship or vessel with intent that such ship or vessel shall be employed in the service of any foreign prince or state to cruise or commit hostilities upon the subjects, citizens or property of another foreign prince or state with whom the United States are at peace, or shall issue or deliver a commission within the territory or jurisdiction of the United States for any ship or vessel to the intent that she may be employed as aforesaid, every such person so offending shall upon conviction be adjudged guilty of a high misdemeanor, and shall be fined and imprisoned at the discretion of the court in which the conviction shall be had, so as the fine to be imposed shall in no case be more than five thousand dollars and the term of imprisonment shall not exceed three years, and every such ship or vessel with her tackle, apparel and furniture together with all materials, arms, ammunition and stores which may have been procured for the building and equipment thereof shall be forfeited, one half to the use of any person who shall give information of the offence, and the other half to the use of the United States."

Act of March 3, 1817, c. 58, 3 Stat. 370 : " That if any person shall, within the limits of the United States, fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or shall knowingly be concerned in the furnishing, fitting out or arming, of any such ship or vessel, with intent that such ship or vessel shall be employed in the service of any foreign prince or state, or of any colony, district or people to cruise or commit hostilities, or to aid or coöperate in any warlike measure whatever, against the subjects, citizens or property, of any prince or state, or of any colony, district or people with whom the United States are at peace,

vent violations of the obligations of the United States as a nation at peace towards belligerent parties and other unlawful acts on the high seas by armed vessels equipped within the waters of the United States," and, "with a view to maintain more effectually the respect due to the laws, to the character, and to the neutral and pacific relations of the United States," recommended further legislative provisions. This message was transmitted to the minister December 27, and he was promptly officially informed of the passage of the act in the succeeding month of March. *Geneva Arbitration, Case of the United States*, 138. In Mr. Dana's elaborate note to § 439 of his edition of Wheaton, it is said that the words "colony, district or people" were inserted on the suggestion of the Spanish minister that the South American provinces in revolt and not recognized as independent might not be included in

every such person so offending shall, upon conviction, be adjudged guilty of a high misdemeanor, and shall be fined and imprisoned at the discretion of the court in which the conviction shall be had, so as the fine to be imposed shall in no case be more than ten thousand dollars, and the term of imprisonment shall not exceed ten years; and every such ship or vessel, with her tackle, apparel and furniture, together with all materials, arms, ammunition and stores, which may have been procured for the building and equipment thereof, shall be forfeited, one half to the use of any person who shall give information, and the other half to the use of the United States."

Act of April 20, 1818, 3 Stat. 447: "SEC. 3. That if any person shall, within the limits of the United States, fit out and arm, or attempt to fit out and arm, or procure to be fitted out and armed, or shall knowingly be concerned in the furnishing, fitting out or arming, of any ship or vessel with intent that such ship or vessel shall be employed in the service of any foreign prince or state, or of any colony, district or people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any colony, district or people, with whom the United States are at peace, or shall issue or deliver a commission within the territory or jurisdiction of the United States, for any ship or vessel, to the intent that she may be employed as aforesaid, every person so offending shall be deemed guilty of a high misdemeanor, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years; and every such ship or vessel, with her tackle, apparel and furniture, together with all materials, arms, ammunition and stores, which may have been procured for the building and equipment thereof, shall be forfeited; one half to the use of the informer, and the other half to the use of the United States."

the word " state."    Under the circumstances this act was
entitled as " to preserve the neutral relations of the United
States," while the title of the act of 1794 described it as " in
addition " to the Crimes Act of April 30, 1790, 1 Stat. 112, c.
9, and the act of 1818 was entitled in the same way.    But
there is nothing in all this to indicate that the words " colony,
district or people " had reference solely to communities whose
belligerency had been recognized, and the history of the times,
an interesting review of which has been furnished us by the
industry of counsel, does not sustain the view that insurgent
districts or bodies, unrecognized as belligerents, were not in-
tended to be embraced.    On the contrary, the reasonable con-
clusion is that the insertion of the words " district or people "
should be attributed to the intention to include such bodies,
as for instance, the so-called Oriental Republic of Artigas,
and the Governments of Pétion and Christophe, whose atti-
tude had been passed on by the courts of New York more
than a year before in *Gelston* v. *Hoyt*, 13 Johns. 141, 561,
which was then pending in this court on writ of error.    There
was no reason why they should not have been included, and
it is to the extended enumeration as covering revolutionary
bodies laying claim to rights of sovereignty, whether recog-
nized or unrecognized, that Chief Justice Marshall manifestly
referred in saying, in *The Gran Para*, 7 Wheat. 471, 489, that
the act of 1817 " adapts the previous laws to the actual situa-
tion of the world."    At all events, Congress imposed no limi-
tation on the words " colony, district or people," by requiring
political recognition.

Of course a political community whose independence has
been recognized is a " state " under the act; and, if a body
embarked in a revolutionary political movement, whose inde-
pendence has not been, but whose belligerency has been, recog-
nized, is also embraced by that term, then the words " colony,
district or people, " instead of being limited to a political
community which has been recognized as a belligerent, must
necessarily be held applicable to a body of insurgents associ-
ated together in a common political enterprise and carrying on
hostilities against the parent country, in the effort to achieve

independence, although recognition of belligerency has not been accorded.

And as agreeably to the principles of international law and the reason of the thing, the recognition of belligerency, while not conferring all the rights of an independent state, concedes to the Government recognized the rights, and imposes upon it the obligations, of an independent state in matters relating to the war being waged, no adequate ground is perceived for holding that acts in aid of such a Government are not in aid of a state in the sense of the statute.

Contemporaneous decisions are not to the contrary; though they throw no special light upon the precise question.

*Gelston* v. *Hoyt*, 3 Wheat. 246, decided at February term, 1818 (and below January and February, 1816), was an action of trespass against the collector and surveyor of the port of New York for seizing the ship American Eagle, her tackle, apparel, etc. The seizure was made July 10, 1810, by order of President Madison under section three of the act of 1794, corresponding to section 5283. The ship was intended for the service of Pétion against Christophe, who had divided the island of Hayti between them and were engaged in a bloody contest, but whose belligerency had not been recognized. It was held that the service of "any foreign prince or state" imported a prince or state which had been recognized by the Government, and as there was no recognition in any manner, the question whether the recognition of the belligerency of a *de facto* sovereignty would bring it within those words, did not arise.

The case of *The Estrella*, 4 Wheat. 298, involved the capture of a Venezuelan privateer on April 24, 1817. There was a recapture by an American vessel, and the prize thus came before the court at New Orleans for adjudication. The privateer was found to have a regular commission from Bolivar, issued as early as 1816, but it had violated section two of the act of 1794, which is the same as section two of the act of 1818, omitting the words "colony, district or people" (and is now section 5282 of the Revised Statutes), by enlisting men at New Orleans, provided Venezuela was

a state within the meaning of that act. The decision proceeded on the ground that Venezuela was to be so regarded on the theory that recognition of belligerency made the belligerent to that intent a state.

In *The Nueva Anna and Liebre*, 6 Wheat. 193, the record of a prize court at "Galveztown," constituted under the authority of the "Mexican Republic," was offered in proof, and this court refused to recognize the belligerent right claimed, because our Government had not acknowledged "the existence of any Mexican Republic or state at war with Spain"; and in *The Gran Para*, 7 Wheat. 471, Chief Justice Marshall referred to Buenos Ayres as a state within the meaning of the act of 1794.

Even if the word "state" as previously employed admitted of a less liberal signification, why should the meaning of the words "colony, district or people" be confined only to parties recognized as belligerent? Neither of these words is used as equivalent to the word "state," for they were added to enlarge the scope of a statute which already contained that word. The statute does not say *foreign* colony, district or people, nor was it necessary, for the reference is to that which is part of the dominion of a foreign prince or state, though acting in hostility to such prince or state. Nor are the words apt if confined to a belligerent. As argued by counsel for the Government, an insurgent colony under the act is the same before as after the recognition of belligerency, as shown by the instance of the colonies of Buenos Ayres and Paraguay, the belligerency of one having been recognized but not of the other, while the statute was plainly applicable to both. Nor is district an appropriate designation of a recognized power *de facto*, since such a power would represent not the territory actually held but the territory covered by the claim of sovereignty. And the word "people," when not used as the equivalent of state or nation, must apply to a body of persons less than a state or nation, and this meaning would be satisfied by considering it as applicable to any consolidated political body.

In *United States* v. *Quincy*, 6 Pet. 445, 467, an indictment under the third section of the act of 1818, the court disposed

of the following, among other points, thus: "The last instruction or opinion asked on the part of the defendant was: That according to the evidence in the cause, the United Provinces of Rio de la Plata is, and was at the time of the offence alleged in the indictment, a government acknowledged by the United States, and thus was a 'state' and not a 'people' within the meaning of the act of Congress under which the defendant is indicted ; the word 'people' in that act being intended to describe communities under an existing government not recognized by the United States; and that the indictment therefore cannot be supported on this evidence.

"The indictment charges that the defendant was concerned in fitting out the Bolivar with intent that she should be employed in the service of a foreign 'people;' that is to say, in the service of the United Provinces of Rio de la Plata. It was in evidence, that the United Provinces of Rio de la Plata had been regularly acknowledged as an independent nation by the Executive Department of the Government of the United States, before the year 1827. And therefore it is argued that the word 'people' is not properly applicable to that nation or power.

"The objection is one purely technical, and we think not well founded. The word 'people,' as here used, is merely descriptive of the power in whose service the vessel was intended to be employed; and it is one of the denominations applied by the act of Congress to a foreign power. The words are, 'in the service of any foreign prince or state, or of any colony, district or people.' The application of the word 'people' is rendered sufficiently certain by what follows under the videlicet, 'that is to say, the United Provinces of Rio de la Plata.' This particularizes that which by the word 'people' is left too general. The descriptions are no way repugnant or inconsistent with each other, and may well stand together. That which comes under the videlicet, only serves to explain what is doubtful and obscure in the word 'people.' "

All that was decided was that any obscurity in the word "people" as applied to a recognized government was cured by the videlicet.

*Nesbitt* v. *Lushington*, 4 T. R. 783, was an action on a policy of insurance in the usual form, and among the perils insured against were "pirates, rovers, thieves," and "arrests, restraints and detainments of all kings, princes and people, of what nation, condition or quality soever." The vessel with a cargo of corn was driven into a port and was seized by a mob who assumed the government of her and forced the captain to sell the corn at a low price. It was ruled that this was a loss by pirates, and the maxim *noscitur a sociis* was applied by Lord Kenyon and Mr. Justice Buller. Mr. Justice Buller said: "'People' means 'the supreme power'; 'the power of the country,' whatever it may be. This appears clear from another part of the policy; for where the underwriters insure against the wrongful acts of individuals, they describe them by the names of 'pirates, rogues, thieves'; then having stated all the individual persons, against whose acts they engage, they mention other risks, those occasioned by the acts of 'kings, princes and *people* of what nation, condition or quality soever.' Those words therefore must apply to 'nations' in their collective capacity."

As remarked in the brief of Messrs. Richard H. Dana, Jr., and Horace Gray, Jr., filed by Mr. Cushing in *Mauran* v. *Insurance Co.*, 6 Wall. 1, the words were "doubtless originally inserted with the view of enumerating all possible forms of government, monarchical, aristocratical, and democratic."

The British Foreign Enlistment Act, 59 Geo. III, c. 69, was bottomed on the act of 1818, and the seventh section, the opening portion of which is given below,[1] corresponded to the

---

[1] "That if any person, within any part of the United Kingdom, or in any part of His Majesty's dominions beyond the seas, shall, without the leave and license of His Majesty for that purpose first had and obtained as aforesaid, equip, furnish, fit out or arm, or attempt or endeavor to equip, furnish, fit out or arm, or procure to be equipped, furnished, fitted out or armed, or shall knowingly aid, assist or be concerned in the equipping, furnishing, fitting out or arming of any Ship or Vessel with intent or in order that such Ship or Vessel shall be employed in the service of any Foreign Prince, State or Potentate, or of any Foreign Colony, Province or part of any Province or People, or of any Person or Persons exercising or assuming to exercise any powers of Government in or over any Foreign State, Colony,

third section of that act. Its terms were, however, considerably broader and left less to construction. But we think the words " colony, district or people " must be treated as equally comprehensive in their bearing here.

In the case of *The Salvador*, L. R. 3 P. C. 218, the Salvador had been seized under warrant of the governor.of the Bahama Islands and proceeded against in the Vice Admiralty Court there for breach of that section, and was, upon the hearing of the cause, ordered to be restored, the court not being satisfied that the vessel was engaged, within the meaning of the section, in aiding parties in insurrection against a foreign government, as such parties did not·assume.to exercise the powers of government over any portion of the territory of such government. This decision was overruled on appeal by the Judicial Committee of the Privy Council, and Lord Cairns, delivering the opinion, said : "It is to be observed that this part of the section is in the alternative. The ship may be employed in the service of a Foreign Prince, State, or Potentate, or Foreign State, Colony, Province or part of any Province or People; that is to say, if you find any consolidated body in the Foreign State, whether it be the Potentate, who has the absolute dominion, or the Government, or a part of the Province or of the People, or the whole of the Province or the People acting for themselves, that is sufficient. But by way of alternative it is suggested that there may be a case where, although you cannot say that the Province, or the People, or a part of the Province or People are employing the ship, there yet may be some person or persons who may

Province or part of any Province or People, as a transport or store ship, or with intent to cruise or commit hostilities against any Prince, State or Potentate, or against the subjects or citizens of any Prince, State or Potentate, or against the persons exercising or assuming to exercise the powers of Government in any Colony, Province or part of any Province or Country, or against the inhabitants of any Foreign Colony, Province or part of any Province or Country, with whom His Majesty shall not then be at war; or shall, within the United Kingdom, or any of His Majesty's dominions, or in any Settlement, Colony, Territory, Island or place belonging or subject to His Majesty,·issue or deliver any Commission for any Ship or Vessel, to the intent that such Ship or Vessel shall be employed as aforesaid," etc.

be exercising, or assuming to exercise, powers of Government in the Foreign Colony or State, drawing the whole of the material aid for the hostile proceedings from abroad; and, therefore, by way of alternative, it is stated to be sufficient, if you find the ship prepared or acting in the service of 'any person or persons exercising, or assuming to exercise, any powers of Government in or over any Foreign State, Colony, Province or part of any Province or people'; but that alternative need not be resorted to, if you find the ship is fitted out and armed for the purpose of being 'employed in the service of any Foreign State or People, or part of any Province or People.' . . .

"It may be (it is not necessary to decide whether it is or not) that you could not state who were the person or persons, or that there were any person or persons exercising, or assuming to exercise, powers of Government in Cuba, in opposition to the Spanish authorities. That may be so : their Lordships express no opinion upon that subject, but they will assume that there might be a difficulty in bringing the case within that second alternative of the section ; but their Lordships are clearly of opinion, that there is no difficulty in bringing the case under the first alternative of the section, because their Lordships find these propositions established beyond all doubt, — there was an insurrection in the island of Cuba; there were insurgents who had formed themselves into a body of people acting together, undertaking and conducting hostilities; these insurgents, beyond all doubt, formed part of the Province or People of Cuba; and beyond all doubt the ship in question was to be employed, and was employed, in connection with and in the service of this body of insurgents."

We regard these observations as entirely apposite, and while the word "people" may mean the entire body of the inhabitants of a state; or the state or nation collectively in its political capacity; or the ruling power of the country; its meaning in this branch of the section, taken in connection with the words "colony" and "district," covers in our judgment any insurgent or insurrectionary "body of people acting together, undertaking and conducting hostilities," although

its belligerency has not been recognized. Nor is this view otherwise than confirmed by the use made of the same words in the succeeding part of the sentence, for they are there employed in another connection, that is, in relation to the cruising, or the commission of hostilities, "against the subjects, citizens or property of any foreign prince or state, or of any colony, district or people, with whom the United States are at peace"; and, as thus used, are affected by obviously different considerations. If the necessity of recognition in respect of the objects of hostilities, by sea or land, were conceded, that would not involve the concession of such necessity in respect of those for whose service the vessel is fitted out.

Any other conclusion rests on the unreasonable assumption that the act is to remain ineffectual unless the Government incurs the restraints and liabilities incident to an acknowledgment of belligerency. On the one hand, pecuniary demands, reprisals or even war, may be the consequence of failure in the performance of obligations towards a friendly power, while on the other, the recognition of belligerency involves the rights of blockade, visitation, search and seizure of contraband articles on the high seas and abandonment of claims for reparation on account of damages suffered by our citizens from the prevalence of warfare.

No intention to circumscribe the means of avoiding the one by imposing as a condition the acceptance of the contingencies of the other can be imputed.

Belligerency is recognized when a political struggle has attained a certain magnitude and affects the interests of the recognizing power; and in the instance of maritime operations, recognition may be compelled, or the vessels of the insurgents, if molesting third parties, may be pursued as pirates. *The Ambrose Light*, 25 Fed. Rep. 408; 3 Whart. Dig. Int. Law, § 381; and authorities cited.

But it belongs to the political department to determine when belligerency shall be recognized, and its action must be accepted according to the terms and intention expressed.

The distinction between recognition of belligerency and recognition of a condition of political revolt, between recog-

nition of the existence of war in a material sense and of war in a legal sense, is sharply illustrated by the case before us. For here the political department has not recognized the existence of a *de facto* belligerent power engaged in hostility with Spain, but has recognized the existence of insurrectionary warfare prevailing before, at the time and since this forfeiture is alleged to have been incurred.

On June 12, 1895, a formal proclamation was issued by the President and countersigned by the Secretary of State, informing the people of the United States that the island of Cuba was "the seat of serious civil disturbances accompanied by armed resistance to the authority of the established government of Spain, a power with which the United States are and desire to remain on terms of peace and amity"; declaring that "the laws of the United States prohibit their citizens, as well as all others being within and subject to their jurisdiction, from taking part in such disturbances adversely to such established government, by accepting or exercising commissions for warlike service against it, by enlistment or procuring others to enlist for such service, by fitting out or arming or procuring to be fitted out and armed ships of war for such service, by augmenting the force of any ship of war engaged in such service and arriving in a port of the United States, and by setting on foot or providing or preparing the means for military enterprises to be carried on from the United States against the territory of such government"; and admonishing all such citizens and other persons to abstain from any violation of these laws.

In his annual message of December 2, 1895, the President said: "Cuba is again gravely disturbed. An insurrection, in some respects more active than the last preceding revolt, which continued from 1868 to 1878, now exists in a large part of the eastern interior of the island, menacing even some populations on the coast. Besides deranging the commercial exchanges of the island, of which our country takes the predominant share, this flagrant condition of hostilities, by arousing sentimental sympathy and inciting adventurous support among our people, has entailed earnest effort on the part of this

Government to enforce obedience to our neutrality laws and to prevent the territory of the United States from being abused as a vantage ground from which to aid those in arms against Spanish sovereignty.

"Whatever may be the traditional sympathy of our countrymen as individuals with a people who seem to be struggling for larger autonomy and greater freedom, deepened as such sympathy naturally must be in behalf of our neighbors, yet the plain duty of their Government is to observe in good faith the recognized obligations of international relationship. The performance of this duty should not be made more difficult by a disregard on the part of our citizens of the obligations growing out of their allegiance to their country, which should restrain them from violating as individuals the neutrality which the nation of which they are members is bound to observe in its relations to friendly sovereign states. Though neither the warmth of our people's sympathy with the Cuban insurgents, nor our loss and material damage consequent upon the futile endeavors thus far made to restore peace and order, nor any shock our humane sensibilities may have received from the cruelties which appear to especially characterize this sanguinary and fiercely conducted war, have in the least shaken the determination of the Government to honestly fulfil every international obligation, yet it is to be earnestly hoped, on every ground, that the devastation of armed conflict may speedily be stayed and order and quiet restored to the distracted island, bringing in their train the activity and thrift of peaceful pursuits."

July 27, 1896, a further proclamation was promulgated, and in the annual message of December 7, 1896, the President called attention to the fact that "the insurrection in Cuba still continues with all its perplexities," and gave an extended review of the situation.

We are thus judicially informed of the existence of an actual conflict of arms in resistance of the authority of a government with which the United States are on terms of peace and amity, although acknowledgment of the insurgents as belligerents by the political department has not taken

place ; and it cannot be doubted that, this being so, the act in question is applicable.

We see no justification for importing into section 5283 words which it does not contain and which would make its operation depend upon the recognition of belligerency ; and while the libel might have been drawn with somewhat greater precision, we are of opinion that it should not have been dismissed.

This conclusion brings us to consider whether the vessel ought to have been released on bond and stipulation.

It is provided by section 938 of the Revised Statutes that —

" Upon the prayer of any claimant to the court, that any vessel, goods, wares or merchandise, seized and prosecuted under any law respecting the revenue from imports or tonnage, or the registering and recording, or the enrolling and licensing, of vessels, or any part thereof, should be delivered to him, the court shall appoint three proper persons to appraise such property, who shall be sworn in open court, or before a commissioner appointed, etc. . . . If, on the return of the appraisement, the claimant, with one or more sureties, to be approved by the court, shall execute a bond to the United States, etc., . . . the court shall, by rule, order such· vessel, goods, wares or merchandise to be delivered to such claimant. . . ."

Section 939 provides for the sale of vessels " condemned by virtue of any law respecting the revenue from imports or tonnage, or the registering and recording, or the enrolling and licensing of vessels, and for which bond shall not have been given by the claimant. . . ."

Section 940 authorizes the judges to do in vacation everything that they could do in term time in regard to bonding and sales, and to " exercise every other incidental power necessary to the complete execution of the authority herein granted."

Section 941 provides :

" When a warrant of arrest or other process *in rem* is issued in any cause of admiralty jurisdiction, except the cases of seizure for forfeiture under any law of the United States, the marshal shall stay the execution of such process, or discharge the property arrested if the process has been levied, on re-

ceiving from the claimant of the property a bond or stipulation in double the amount claimed by the libellant, with sufficient surety, to be approved by the judge, etc. . . ."

By section 917 this court may prescribe rules of practice in admiralty "in any manner not inconsistent with any law of the United States."

Rule 10, as thus prescribed, provides for the sale of perishable articles or their delivery upon security to "abide by and pay the money awarded by the final decree."

Rule 11 is as follows:

"In like manner, where any ship shall be arrested, the same may, upon the application of the claimant, be delivered to him upon a due appraisement, to be had under the direction of the court, upon the claimant's depositing in court so much money as the court shall order, or upon his giving a stipulation, with sureties, as aforesaid; and if the claimant shall decline any such application, then the court may, in its discretion, upon the application of either party, upon due cause shown, order a sale of such ship, and the proceeds thereof to be brought into court or otherwise disposed of, as it may deem most for the benefit of all concerned."

In *The Mary N. Hogan,* 17 Fed. Rep. 813, Judge Brown, of the Southern District of New York, refused to deliver the vessel on stipulation, and referring to Rule 11, said that it was not in form imperative in all cases, but left to the court a discretion which might be rightly exercised under peculiar circumstances; and that the rule clearly should not be applied where the object of the suit was "not the enforcement of any money demand, nor to secure any payment of damages, but to take possession of and forfeit the vessel herself in order to prevent her departure upon an unlawful expedition in violation of the neutrality laws of the United States." And he added: "It is clearly not the intention of section 5283, in imposing a forfeiture, to accept the value of the vessel as the price of a hostile expedition against a friendly power, which might entail a hundredfold greater liabilities on the part of the Government. No unnecessary interpretation of the rules should be adopted which would permit that result; and yet

such might be the result, and even the expected result, of a release of the vessel on bond. The plain intent of section 5283 is effectually to prevent any such expedition altogether, through the seizure and forfeiture of the vessel herself. The Government is, therefore, entitled to retain her in custody, and Rule 11 cannot be properly applied to such a case."

In *The Alligator*, 1 Gall. 145 (decided in 1812), Mr. Justice Story referred to an invariable practice in all proper cases of seizure, to take bonds for the property whenever application was made by the claimant for the purpose, but that was a case where the claimant had been allowed to give bond without objection and was attempting to avoid payment by alleging its irregularity; and in *The Struggle*, 1 Gall. 476 (1813), the same eminent judge, in making a similar ruling, said: "That where the claimant voluntarily accepts a delivery on bail, it is an estoppel of his right to contest the validity of the security."

But in section 941 of the Revised Statutes the exception was introduced of " cases of seizure for forfeiture under any law of the United States." And it seems obvious that the release on bond of a vessel charged with liability to forfeiture under section 5283, before answer or hearing, and against the objection of the United States, could not have been contemplated. However, as this application was not based upon absolute right, but addressed to the sound discretion of the court, it is enough to hold that, under the circumstances of this case, the vessel should not have been released as it was, and should be recalled on the ground that the order of release was improvidently made. *United States* v. *Ames*, 99 U. S. 35, 39, 41, 43. If the vessel is held without probable cause her owners can recover demurrage, and, moreover, vessels so situated are frequently allowed to pursue their ordinary avocations while in custody pending suit, under proper supervision, and in order to prevent hardship.

*The decree must be reversed, and the cause remanded to the District Court with directions to resume custody of the vessel and proceed with the case in conformity with this opinion.*

*Ordered accordingly.*

Mr. Justice Harlan dissenting.

I am unable to concur in the views expressed by the court in the opinion just delivered. In my judgment a very strained construction has been put on the statute [1] under which this case arises — one not justified by its words, or by any facts disclosed by the record, or by any facts of a public character of which we may take judicial cognizance. It seems to me that the better construction is that given by the learned judge of the District Court. I concur in the general views expressed in his able and satisfactory opinion, which is given below. That opinion so clearly and forcibly states the reasons in support of the conclusion reached by me that I am relieved of the labor of preparing one, which I would be glad to do, if the pressure in respect of other business in the court did not render that course impracticable.

The present case has been made to depend largely upon the language of public documents issued by the Executive branch of the government. If the defects in the libel can be supplied in that way, reference should be made to the last annual message and accompanying documents sent by President Cleveland to the Congress of the United States. In that message the President said that the so-called Cuban government had given up all attempt to exercise its functions, and that it was "confessedly (what there is the best reason for

---

[1] "§ 5283. Every person who, within the limits of the United States, fits out and arms, or attempts to fit out and arm, or procures to be fitted out and armed, or knowingly is concerned in the furnishing, fitting out or arming, of any vessel with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district or people, to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state, or of any colony, district or people, with whom the United States are at peace, or who issues or delivers a commission within the territory or jurisdiction of the United States for any vessel, to the intent that she may be so employed, shall be deemed guilty of a high misdemeanor, and shall be fined not more than ten thousand dollars, and imprisoned not more than three years. And every such vessel, her tackle; apparel and furniture, together with all materials, arms, ammunition and stores, which may have been procured for the building and equipment thereof, shall be forfeited; one half to the use of the informer and the other half to the use of the United States."

supposing it always to have been in fact) a government merely on paper." And in his report to the President, under date of December 7, 1896, the Secretary of State said: "So far as our information shows, there is not only no effective local government by the insurgents in the territories they overrun, but there is not even a tangible pretence to establish administration anywhere. Their organization, confined to the shifting exigencies of the military operations of the hour, is nomadic, without definite centres, and lacking the most elementary features of municipal government. There nowhere appears the nucleus of statehood. The machinery for exercising the legitimate rights and powers of sovereignty and responding to the obligations which *de facto* sovereignty entails in the face of equal rights of other States is conspicuously lacking. It is not possible to discern a homogeneous political entity, possessing and exercising the functions of administration and capable, if left to itself, of maintaining orderly government in its own territory and sustaining normal relations with the external family of governments."

It does not seem to me that the persons thus described as having no government except one on paper, with no power of administration, and entirely nomadic, constitute a colony, district or "people" within the meaning of the statute. In my opinion, the words "of any colony, district or people" should be interpreted as applying only to a colony, district or people that have "subjects, citizens or property." I cannot agree that the persons described by the President and Secretary of State can be properly regarded as constituting a colony, district or people, having subjects, citizens or property. It cannot be that the words "any colony, district or people," where they first appear in section 5283, have any different meaning from the same words in a subsequent clause, "the subjects, citizens or property . . . of any colony, district or people, with whom the United States are at peace." The United States cannot properly be said to be "at peace," or not "at peace," with insurgents, who have no government, except "on paper," no power of administration, and are merely nomads.

The opinion of Locke, District Judge, adopted by MR. JUS-
TICE HARLAN, is as follows:

" This vessel has been libelled for forfeiture under the pro-
visions of section 5283 of the Revised Statutes of the United
States.

" The libel alleges that said steam vessel was on the 23d day
of May, A.D. 1896, furnished, fitted out and armed ' with intent
that she should be employed by certain insurgents or persons
in the island of Cuba to cruise or commit hostilities against the
subjects, citizens or property of the said island of Cuba and
against the King of Spain, and the subjects, citizens and
property of the said King of Spain in the island of Cuba,
with whom the United States are and were at that date at
peace.'

" To this there have been exceptions filed upon two grounds:

" 1st. That forfeiture under this section depends upon the
conviction of a person or persons for doing the acts denounced;
and

" 2d. That the libel does not show that the vessel was
armed or fitted out with the intention that she should be
employed in the service of a foreign prince or state, or of any
colony, district or people recognized or known to the United
States as a body politic.

" The first objection raised by these exceptions is easily dis-
posed of by the language of the Supreme Court in the case of
*The Palmyra*, 12 Wheat. 1, where, after elaborate argument,
it is said:

" ' Many cases exist, when the forfeiture for acts done
attaches solely *in rem* and there is no accompanying penalty *in
personam ;* many cases exist where there is both a forfeiture
*in rem* and a personal penalty; but in neither class of cases has
it ever been decided that the prosecutions were dependent upon
each other. But the practice has been, and so this court under-
stands the law to be, that the proceeding *in rem* stands indepen-
dent and wholly unaffected by any criminal proceeding *in
personam.*' . . . ' In the judgment of this court no per-
sonal conviction of the offender is necessary to enforce a for-
feiture *in rem* in cases of this nature.'

" The other question raised by the exceptions is more difficult and requires a construction of the clause of the section 5283, ' with intent that such vessel should be employed in the service of any foreign prince or state, or of any colony, district or people,' and more particularly the significance of the words ' colony, district or people,' and a determination whether the requirements of the law are satisfied by the allegations of the libel that the vessel was intended to be employed ' in the service of certain insurgents or persons in the island of Cuba,' and whether the statute admits a construction which would make a vessel liable to forfeiture when fitted out for the intended employment of any one or more persons not recognized as a political power by the Executive of our nation.

" The section under which this libel has been filed was originally the third section of the act of June 5, 1794, 1 Stat. 281, c. 50, and the language at that time only contained the provision that the vessel should be fitted out with intent that said vessel should be employed in the service of any foreign prince or state to cruise or commit hostilities against the subjects, citizens or property of any foreign prince or state with whom the United States might be at peace.

" While that was the language of the act, the question came before the Supreme Court in the case of *Gelston* v. *Hoyt*, 3 Wheat. 246, 328, and, in speaking of a plea considered necessary for a defence to a suit for damages for a seizure under this statute, it was held that such plea was bad, ' because it does not aver that the Governments of Pétion and Christophe are foreign states which have been duly recognized as such by the Government of the United States.'

" In this case there was no distinction made between the party in whose service the vessel was to be employed and the one against whom hostilities were intended, and the language of the court would fully justify the conclusion they should both have been recognized, either as princes or states.

" Subsequently, as is stated by Mr. Wharton in his work on International Law, upon the outbreak of war between the South American colonies and Spain, upon a special message

of the President to Congress upon the subject, the words 'or of any colony, district or people' were added to the description of both parties contemplated — both that one into whose employment the vessel was to enter, and that one against whom the hostilities were contemplated.

"Has the addition of these words changed the character of the party intending to employ such vessel from that of a political power duly recognized as such, as is declared by the court in *Gelston* v. *Hoyt*, to that of a collection of individuals without any recognized political position? This question has been before the courts frequently, and several times been examined and commented upon, but in no case which I have been able to find has it been so presented, unconnected with questions of fact, that there has been a ruling upon it so that it can be considered as final and conclusive.

"Beyond question the courts are bound by the actions of the political branch of the Government in the recognition of the political character and relations of foreign nations, and of the conditions of peace or war.

"The act of 1794, as well as its modification, that act of 1818, used the same language in describing the power or party in whose behalf or into whose service the vessel was intended to enter as was used in describing the political power against which it is intended that hostilities should be committed; and as far as the language itself goes it is impossible to say that in using the words in one clause of the sentence the political character and power was intended, while in another clause of the same sentence words used in exactly the same connection and with apparently the same force and meaning were intended to represent not the political power but the individuals of a certain colony, district or people.

"It is contended that although the original act of 1794 required the construction given it in *Gelston* v. *Hoyt*, that each party should be one duly recognized by the United States, yet the modification of 1818 so changed it that it should be held to apply to any persons, regardless of their political character, for whose service a vessel might be intended.

"It is understood that this modification was brought about

by the special message of President Madison of December 26, 1816. The question presented by this message is clearly set forth in the language used. He says: 'It is found that the existing laws have not the efficacy necessary to prevent violations of the United States as a nation at peace towards belligerent parties and other unlawful acts on the high seas by armed vessels equipped within the waters of the United States.'

"In further explanation of the condition of affairs which called for this modification of this statute may be considered the letter of Mr. Monroe, Secretary of State, to Mr. Forsyth, January 10, 1817, in which he speaks of vessels going out as merchant vessels and hoisting the flag of some of the belligerents and cruised under it, of other vessels armed and equipped in our ports hoisting such flags after getting out to sea, and of vessels having taken on board citizens of the United States, who, upon the arrival at neutral points, have assumed the character of officers and soldiers in the service of some of the parties in the contest then prevailing. All of this correspondence shows that the effort at that time was to enforce neutrality between recognized and belligerent parties. That the parties then in contest were recognized as belligerents and a neutrality was sought to be preserved is clearly shown by the first annual message of President Monroe in 1817. He says: 'Through every stage of the conflict the United States have maintained an impartial neutrality, giving aid to neither of the parties in men, money, ships or munitions of war. They have regarded the contest not in the light of an ordinary insurrection or rebellion, but as a civil war between parties nearly equal, having as to neutral powers equal rights. Our ports have been opened to both, and any articles . . . that either was permitted to take have been equally free to the other.'

"It is considered that this shows what was in contemplation at the time of the enactment of the law of 1818, and that what was intended was to prevent the fitting out of vessels to be employed in the service of a colony, district or people, which had been recognized as belligerents, but which had not been recognized as an independent state, or which was not represented in the political world by a prince.

"There appears to be nothing in the remedy demanded at that time, or in the language used, to show that the words so added were intended to represent or be construed as referring to the individual people of any colony, district or people, or any number of them however designated, except as in their collective representative political capacity, any more than there is to show that the term 'state' in the original was intended to refer to the individual people of the state.

"The language of the foreign enlistment act of Great Britain, 59 Geo. III, c. 69, § 7, leaves no question as to the intention of Parliament in that legislation, as it added to the words of our statute the words, 'or part of any province or people or of any person exercising or assuming to exercise any powers of government in or over any foreign state, colony, province or parts of any province or people.'

"In order to give the statute under which this libel is brought the force contended for by the libellant, it is necessary to eliminate from the provision that makes it necessary to declare how the vessel is to be employed the entire clause 'in the service of any foreign prince or state, or of any colony, district or people,' or to read into it the language found in the act of Great Britain, or its equivalent. That it was the general understanding at the time of the passage of the original act that it was considered to apply only to duly recognized nations is shown by the fact that, in the case of the *United States* v. *Guinet*, 2 Dall. 321, under this same section — the first case brought under it — the indictment alleged fully in terms that both the state of the Republic of France, in whose service the vessel was to be employed, and the King of Great Britain were a state and a prince with whom the United States were at peace.

"In the case of the *United States* v. *Quincy*, 6 Pet. 445, the Supreme Court says that the word 'people' was used in this statute as simply descriptive of the power in whose service the vessel was intended to be employed, and is one of the denominations applied by the acts of Congress to a foreign power.

"In the case of *The Meteor*, 17 Fed. Cas. 178 ; 26 Fed. Cas. 1241, where the original libel alleged that the vessel was fitted

out with the intent that she should be employed in the service of certain persons to commit hostilities against the Government of Spain, it was considered necessary to amend it by alleging that she was intended to be employed by the Government of Chili; and in that case there was presented a certificate of the Secretary of State, under seal, of the fact of the war existing between Spain and Chili, and that they were both nations with whom the United States were at peace.

" In addition to the declaration of the Supreme Court in the cases of *Gelston* v. *Hoyt* and the *United States* v. *Quincy,* this question has been incidentally under examination in several cases in the lower courts. In the case of *The Carondelet,* 37 Fed. Rep. 799, Judge Brown says: ' Section 5283 is designed in general to secure our neutrality between foreign belligerent powers. But there can be no obligation of neutrality except towards some recognized state or power, *de jure* or *de facto.* Neutrality presupposes two belligerents, at least, and as respects any recognition of belligerency — *i.e.,* of belligerent rights — the judiciary must follow the executive. To fall within the statute, the vessel must be intended to be employed in the service of one foreign prince, state, colony, district or people to cruise or commit hostilities against the subjects, citizens or property of another with which the United States are at peace. The United States can hardly be said to be at peace, in the sense of the statute, with a faction which they are unwilling to recognize as a government; nor could the cruising or committing of hostilities against such a mere faction well be said to be committing hostilities against the subjects, citizens or property of a district or people within the meaning of the statute. So, on the other hand, a vessel in entering the service of the opposite faction of Hippolyte, could hardly be said to enter the service of a foreign prince or state, or of a colony, district or people, unless our Government had recognized Hippolyte's faction as at least constituting a belligerent, which it does not appear to have done.'

" In the case of *The Conserva,* 38 Fed. Rep. 431, a case in which it was alleged the vessel was to be used in a contest between Légitime and Hippolyte, Judge Benedict says: ' The

libel in this case charges certain facts to have been done in connection with the vessel with the intention that the vessel be employed in the service of certain rebels in a state of insurrection against the organized and recognized Government of Hayti, to cruise and commit hostilities against the subjects, citizens or property of the Republic of Hayti, with whom the United States are at peace. A violation of the neutrality which the United States is obliged to maintain between the rebels mentioned and the Government of the Republic of Hayti is the gravamen of the charge. But the evidence fails to show a state of facts from which the court concluded that the United States was ever under any obligation of neutrality to the rebels mentioned, or is now under any obligation of neutrality to the Government of the Republic of Hayti.'

"In the case of *United States* v. *Trumbull*, 48 Fed. Rep. 99, Judge Ross carefully reviews the different authorities, examines the question and clearly indicates how he would have decided the question had it been necessary for the purposes of deciding the case before him. He says: 'Does section 5283 of the Revised Statutes apply to any people whom it is optional with the United States to treat as pirates? That section is found in the chapter headed "Neutrality," and it was carried into the Revised Statutes, and was originally enacted in furtherance of the obligations of the nations as a neutral. The very idea of neutrality imports that the neutral will treat each contending party alike; and it will accord no right or privilege to one that it withholds from the other, and will withhold none from one that it accords to the other.'

"In speaking of the case of *United States* v. *Quincy*, in which it was said that the word 'people' 'was one of the denominations applied by the act of Congress to a foreign power,' he says: 'This can hardly mean an association of people in no way recognized by the United States or by the government against which they are rebelling, whose rebellion has not attained the dignity of war, and who may, at the option of the United States, be treated by them as pirates.'

"In the case of *United States* v. *The Itata*, 56 Fed. Rep. 505, on appeal before the Circuit Court of Appeals, the ques-

tion was fully and carefully considered in an elaborate opinion, and although not found necessary to decide the question in this case, as the case was disposed of upon other grounds, it is considered to be apparent how the question would have been decided had it been necessary. The force of the word 'people,' as used in this statute, is carefully examined, as well as all other questions, and it is considered that the force of the conclusion which must necessarily result from such investigations cannot be avoided.

"In the case of *United States* v. *Hart et al.*, Judge Brown expresses his view of this section by saying: 'Section 5283 deals with armed cruisers, designed to commit hostilities in favor of one foreign power as against another foreign power with whom we are at peace.'

"The same language is used by the court in the case of the *United States* v. *Wiborg*, 163 U. S. 632, but it is contended in behalf of the libellant that this language was modified by the subsequent declaration made in the same case, that the operation of this statute is not necessarily dependent on the existence of such state of belligerency. In using the latter language it would seem that the court had the entire statute under contemplation, and more particularly § 5286, Rev. Stat., the sixth section of the original act, which plainly does not depend upon a state of belligerency or neutrality. This was the section then under consideration, as the immediate context and following sentence show, and was the section upon which the suit was based; and it cannot be considered that this language was intended to apply to another section, the consideration of which was in no way called in question.

"With this understanding of the language in this case, in that case, every judicial decision, remark or ruling, where the question has been under consideration or examination, appears to be in favor of the position taken by the claimants in the exceptions.

"In the case of *The Mary N. Hogan*, 18 Fed. Rep. 529, and in the cases of the intended charge of that vessel, boxes of arms and ammunition (20 Fed. Rep. 50), it does not appear that this question was raised by the claimant or considered by

the learned judge; and his language in the subsequent case of *The Carondelet*, where it was raised and discussed, may be accepted as presumptive proof of what his decision would have been, had it been so considered.

" The same is true of the case of *The City of Mexico*, 28 Fed. Rep. 148, decided by me in this court. In that case the defence was upon entirely different grounds, and the force of the portion of the statute contended for, the necessity that there should be an intent not only that the vessel should intend to commit hostilities, but that for such purposes she should be employed in the service of some political power, was entirely lost sight of and eliminated from the consideration of the case.

" The only expression authoritatively given which I have been able to find opposed to the view of the claimant in his exceptions is that of a portion of the letter of the honorable Attorney General to the Secretary of State, of December 16, 1869, 13 Op. Att'y Gen. 177, and cited in the case of *United States* v. *Wiborg*. I do not consider that I should be doing myself justice to pass that by unnoticed, as it has raised more questions in my mind and called for and compelled more thought and consideration than anything else connected with the case; but I feel compelled to reach a different conclusion than is there expressed.

" The general purpose and intent of that letter was to declare that the insurrection in Cuba was not a fitting opportunity to enforce the provisions of this law, inasmuch as we owed no duty to such insurgents to protect them from hostilities, or rather that any contest between Spain and such insurgents could not be considered as hostilities, but incidentally it was stated that a condition of belligerency was not necessary for the operation of this statute.

" It could not be considered that we owed such insurgents no such duty, not because we were not at peace with them, but because we had never recognized them as a colony, district or people.

" The force and effect of the letter was that the Cuban insurgents had not been recognized as a colony, district or

people, and, therefore, this section did not apply. If they had not been then so recognized or were not entitled to be so recognized, how can they now be so recognized or described as to come within terms of the statute in question?

"It is considered that the argument used in such letter to show that the statute should be held applicable to cases where there was no condition of belligerency and but one political power recognized, would have been fully as applicable under the old law, when the case of *Gelston* v. *Hoyt* decided to the contrary.

"The fact that a vessel was fitted out to be employed in the service of a prince would not necessarily imply that such prince was a political power recognized by the United States any more than would the terms a 'colony, district or people' under the act of 1818. But the Supreme Court clearly held in that case that it must be alleged that such prince or state has been recognized as such by the United States. The same argument used therein would call for the application of this statute for the forfeiting of any vessel fitted out to be employed by any person, individual, corporation or firm, for the purpose of committing hostilities against a state at peace, which would plainly not come within the provisions of the statute, however much it might be considered international policy or proper national conduct.

"It is impossible in my view of the construction required by the language used to properly apply the term 'a people,' used in the connection in which it is found, to any persons few in number and occupying a small territory with no recognized political organization, although they might procure the fitting out and arming of a vessel. I fail to find any ground for giving this statute, a criminal one as it is, any but its ordinary application. The question presented is clear and distinct, are 'certain insurgents or persons in the island of Cuba' properly described by either of the terms a 'colony,' a 'district' or a 'people,' and if so, which? The inconveniences which might arise from the political branch of our government recognizing such insurgents as a colony, district or people having political existence and as belligerents cannot be considered in determining whether they are entitled to such description.

Dissenting Opinion: Harlan, J.

"This statute is a criminal and penal one, and is not to be enlarged beyond what the language clearly expresses as being intended. It is not the privilege of courts to construe such statutes according to the emergency of the occasion, or according to temporary questions of policy, but according to the principles considered to have been established by a line of judicial decisions.

"It is contended that if the principles embodied in the exceptions are declared to be the law, there can be no law for the prevention of the fitting out of armed and hostile vessels to stir up insurrections and commit hostilities against nations with which we are at peace, and that such conclusion would make the parties engaged in any such expedition liable to prosecution as pirates.

"To the first of these points it is considered that section 5286 is, as has been constantly held, intended to prevent any such expeditions, regardless of the character of the parties in whose behalf they were organized, the only distinction being that in that case it is necessary to bring a criminal suit and prove overt acts, while under this portion of this section the intent is the gravamen of the charge and the prosecution is against the vessel, regardless of the persons engaged in the fitting out or the ignorance or innocence of the owners.

"This is not a case that can be or should be determined upon questions of public policy, and whether any parties subject themselves to prosecution for piracy or not should have no weight in its consideration. If they should be so subject they would have the benefit of the necessity of proving piratical acts rather than intentions.

"It is certainly considered to be true that any such parties would be considered as pirates by Spain, and would be treated as such if found in any acts of hostility, regardless of any recognition this nation might give them by considering them as having any political character as a people.

"Without attempting further argument, but regretting that the pressing duties of a very busy term of jury trials have prevented a fuller and more complete expression of my views, it is my conclusion that the line of judicial decisions demands

that a construction should be put upon the section in question which would hold that it was the intention of Congress in such enactment to prevent recognized political powers from having vessels prepared for their service in the United States, but that it was not the intention to extend such prohibition to vessels fitted out to be employed by individuals or private parties, however they might be designated, for piratical or other hostilities where no protection could be obtained by a commission from a recognized government. In such case they would be held liable under the section which provides for the fitting out of a military expedition, or if they were guilty of any piratical acts upon the high seas they would become liable under the laws for the punishment of such acts. It is considered that at the time of the amendment of 1818 this construction had been declared, and the language of the amendment was in no way intended to change such construction, but was only intended to apply to the new designation of political powers, the existence of which had been recognized as belligerents if not as independents, and who were entitled to the right of neutrals; that the libel herein does not state such a case as is contemplated by the statute, in that it does not allege that said vessel had been fitted out with intent that she be employed in the service of any foreign prince or state, or of any colony, district or people recognized as such by the political power of the United States, and unless it can be so amended should be dismissed, and it is so ordered.

\*　　　　\*　　　　\*　　　　\*　　　　\*

"Since writing the foregoing, the libel herein has been amended by inserting in place of 'by certain insurgents or persons in the island of Cuba,' the words 'in the service of a certain people, to wit, certain people then engaged in armed resistance to the Government of the King of Spain in the island of Cuba,' but it is considered that the objection to the libel in sustaining the exceptions has not been overcome, but that although the language has been somewhat changed, the substance has not been amended in the material part, inasmuch as it appears clearly that the word 'people' is used in an individual and personal sense, and not as an organized and

recognized political power in any way corresponding to a state, prince, colony or district, and can in no way change my conclusion heretofore expressed, and the libel must be dismissed."